## HALLIBURTON COMPANY

v.

## The UNITED STATES.

### No. 611–81T.

United States Claims Court.

Dec. 16, 1983.

Daniel L. Penner, Fort Worth, Tex., for plaintiff.

Allan C. Lewis, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., and Theodore D. Peyser, Jr., Washington, D.C., for defendant.

### OPINION

WHITE, Senior Judge.

Halliburton Company ("Halliburton" or "the plaintiff") alleges in the complaint[1] that the defendant (acting through the Internal Revenue Service, Department of the Treasury) illegally and erroneously assessed, and required the plaintiff to pay, highway use taxes and interest thereon, in the total amount of $126,579.68, for the tax years beginning July 1, 1974, July 1, 1975, and July 1, 1976. The plaintiff sues to recover the amount stated, plus statutory interest.[2]

Halliburton is a Texas corporation, with its principal office in Dallas, Texas, and with district offices located in oil and gas producing areas of Texas and some other States.[3]

Halliburton is engaged in the business of providing specialized services that are utilized in drilling and operating oil and gas wells. The services relevant to this action consist principally of cementing, acidizing, fracturing, logging, and perforating oil and

---

1. Filed as a petition in this court's predecessor, the United States Court of Claims.

2. The plaintiff has conceded that units Nos. 8783, 0539, 0109, 0180, 0181, and 0410 were taxable. Hence, they are excluded from the following discussion.

3. One of Halliburton's divisions, known as Welex, operates under its own name. For the sake of convenience, the term "Halliburton," as used in this opinion, includes the entire corporation, including Welex.

gas wells at the well site. The plaintiffs' oil field servicing equipment—*i.e.,* the cementing, acidizing, fracturing, logging, or perforating equipment—is permanently mounted (as explained later in the opinion) on a truck chassis in order to provide mobility for the equipment. The combined unit, being mobile, moves to a well site and is connected to the wellhead to be serviced.

### Discussion

The highway use tax is imposed by 26 U.S.C. § 4481(a) (Supp. V), which provides in pertinent part that "[a] tax is hereby imposed on the use of any highway motor vehicle which * * * has a taxable gross weight of more than 26,000 pounds, at the rate of $3.00 a year for each 1,000 pounds of taxable gross weight or fraction thereof. * * *"

The term "highway motor vehicle" is defined in 26 U.S.C. § 4482(a) (Supp. V) to mean "any motor vehicle which is a highway vehicle."

■ District courts have held, with seemingly unanimity, that the test to be applied in determining the applicability or non-applicability of this tax to a particular motor vehicle is whether the vehicle is designed primarily for highway transportation or primarily for off-highway use. *Rossi v. United States,* 220 F.Supp. 694, 696 (D.Maine 1963); *Carl Nelson Logging Co. v. United States,* 281 F.Supp. 671, 673–74 (D.Idaho 1967); *Stafford Well Service, Inc. v. United States,* 340 F.Supp. 657, 659–60 (D.Wyo. 1972); *Allied Bitumens, Inc. v. United States,* 353 F.Supp. 1128, 1130 (W.D.N.Y. 1973), *aff'd per curiam,* 485 F.2d 1237 (2d Cir.1973).

■ The evidence in the present record makes it plain, and it is found as a fact, that Halliburton's units involved in this case were primarily designed and predominantly used for off-highway purposes.

Halliburton uses public highways in connection with the performance of its oil field services, but only to the extent necessary to move a unit to a well site, or to return the unit, after completing a job, from the well site to a district office pending another assignment for the unit. Halliburton's units spend approximately 70 percent of their time at job sites, and only 30 percent in traveling to and from job sites. Approximately 70 percent of the travel time is spent on private roads leading from public highways to well sites, as many of the wells serviced by Halliburton are remotely situated and can be reached only by traveling substantial distances off public highways and on private roads.

Although the terrain of a typical job performed by Halliburton may be relatively flat, Halliburton's units are ruggedly constructed in order to meet the exigencies of the extreme conditions that are frequently encountered on private roads with such rocky, uneven, or muddy surfaces that they would be difficult or impossible to traverse without specially designed mobile units. In many situations, because of muddy conditions at a job site, it is necessary that a unit be positioned at the well site by the use of a tracked vehicle, such as Caterpillar equipment. The positioning is done by pushing or pulling the unit with a Caterpillar from front to rear or from rear to front, or, in some instances, by shoving the unit from the side into position.

Thus, Halliburton's units are primarily designed as off-highway vehicles, and they are used predominantly for off-highway functions. Any highway use is merely incidental to a unit's primary design and predominant use. A significant fact in this regard is that the roading engine of a unit is necessary for the operation of the equipment mounted on the deck, and the deck equipment can only be utilized when the unit is not moving.

Halliburton's units travel over public highways at an average speed of 30–35 miles per hour (although the units are capable of traveling at a maximum speed of 55 miles per hour on a level highway).

Halliburton's units are not used on the highway to transport any persons or property, except in connection with rendering the services previously mentioned.

Because of Halliburton's need for specially designed mobile units adequate to cope with unfavorable off-highway conditions, and otherwise capable of performing, with maximum economy and effectiveness, the services rendered by the company, Halliburton maintains an engineering department whose function it is to study and develop the necessary equipment features and to select the chassis components needed to provide support and mobility for the equipment. The engineering department is guided, in order, by the following considerations: well site performance, safety, off-highway use, durability and maneuverability, and highway restraints.

Halliburton's engineers have devoted tens of thousands of hours into selecting the components of the truck chassis which it purchases to provide support and mobility for its oil field servicing equipment, and designing the deck equipment for its units. The chassis components are specially selected in order to accommodate the special equipment that Halliburton uses in the performance of its oil field services; and most of the components are non-standard, insofar as the possible use of the chassis for highway transportation is concerned.

Halliburton selects the special chassis components and designs the deck equipment for the extremes of conditions to be encountered in the field, rather than the norms.

Halliburton's engineers select the components for a chassis in conjunction with representatives of a chassis manufacturer, after the engineers, upon the basis of careful study, have determined the physical demands that the type of servicing equipment which is to be mounted on the chassis will make upon it.

Special chassis components utilized by Halliburton to meet the special needs of its equipment include the following: special cross-members are used between the chassis rails to act as mounts for Halliburton's equipment, the cross-members being located individually by the manufacturer to suit Halliburton's applications; special heavy-duty front and rear bumpers are used on all units, the bumpers being made to Halliburton's specifications; heavy-duty front spring brackets are used on all units; two additional brake chambers are used on the rear axle of most units (spring brakes); 16-inch diameter air tanks are used on all units (in lieu of the standard 9-inch air tanks); a "straight beam" front axle is specified on all units for greater ground clearance in off-highway use; the engine is mounted at zero degrees on all blender units (instead of the standard 3-to-4 degrees); maximum engine cooling for stationary operation is specified on all units; a special 10,000-foot-pound capability Foote Brothers transfer case, manufactured to Halliburton's specifications, is installed on the blender units (at a cost of approximately $10,000, as compared with the cost of approximately $300 for a standard option power take-off); special 20-inch diameter fuel tanks are used to provide maximum ground clearance (the locations for such tanks being specified by Halliburton on all units, and the bracketry for the fuel tanks is specially constructed to match the diameter of the tanks); reinforced tube-type equalizer lines are required for fuel tanks on all units for protection in off-highway operations and ground clearance; cast-iron flywheel housing is required on all units (rather than standard aluminum); channel-type rim spacers are installed on all units (rather than the standard accordion), for off-highway use; an extra long, inner-reinforced section is installed in the bogey area of cementing and fracturing chassis; duplex front tires, wider than normal front tires, are used on acidizing, cementing, and fracturing units; a dual mode, variable speed governor is used on all units; the manual transmission used on all units is equipped with a remote shift in order to operate the engine from two stations (from the cab and also from the deck control position); power steering is provided on all units; heavy-duty universal joints are provided on all units; and low gear reduction is used on all units, resulting in a minimum gradability of 25 percent.

Although components similar to some of those specified by Halliburton for its chassis might be found on trucks involved in highway transportation, Halliburton's combination of chassis components is unique and makes Halliburton's units special.

Truck manufacturers do not manufacture for Halliburton chassis with all the special features required by Halliburton without a firm order from Halliburton. The special features make Halliburton's chassis considerably more expensive to acquire and to maintain than are similar models of chassis designed for highway use.

Halliburton's chassis are designed solely as mobile carriages, mounts, and power sources for Halliburton's oil field servicing equipment.

A chassis, including the special components specified by Halliburton, is delivered by the manufacturer to Halliburton in bare form. Halliburton completes the chassis by bolting to the frame the necessary brackets and additional members, including over-rail cross-members, that are to be used as equipment mounts. Machinery and equipment are then bolted or welded to these items. The entire unit is designed as an integral structure; and the added members, including the over-rail cross-members, provide additional tortional strength to the chassis.

As indicated in the preceding summary of the facts, Halliburton's units involved in this case were primarily designed and predominantly used for off-highway purposes. Accordingly, under the test announced and applied by the judicial authorities cited earlier in the opinion, Halliburton's units were not taxable as highway motor vehicles under 26 U.S.C. § 4481(a).

In this connection, it must be noted that, at the times when the earlier judicial decisions were rendered, the applicable administrative definition of the term "highway motor vehicle" was set out in 26 C.F.R. § 41.4482(a)–1. That regulation stated that the term meant "any vehicle which is propelled by means of its own motor * * * and which is of a type used for highway transportation," but did not include "any vehicle which, although propelled by means of its own motor, is of a type not used for highway transportation * * *."

The administrative definition of "highway motor vehicle" referred to in the preceding paragraph was still in effect during the greater part of the time involved in the present case, i.e., from July 1, 1974, until January 13, 1977.

On January 13, 1977, the Treasury Department promulgated (42 Fed.Reg. 2672) a regulation providing a new definition for the term "highway vehicle." The new regulation (26 C.F.R. § 48.4061(a)–1(d)(1)) defined the term "highway vehicle" to mean "any self-propelled vehicle * * * designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions * * *."

The validity of this new definition, with respect to the taxability of vehicles after the promulgation of the regulation on January 13, 1977, was upheld by the United States Court of Appeals for the Fifth Circuit in *Western Company of North America v. United States*, 699 F.2d 264 (5th Cir. 1983). In that case, Western sued for a refund of both special fuels and highway use taxes previously paid for the period 1971–77. Western's units were used for the cementing, acidizing, and fracturing of oil and gas wells at the well sites. The question of the taxability of Western's units was tried before a jury. The district court asked the jury to apply, in turn, both the pre-1977 and the 1977 definitions of highway motor vehicles to the various categories of vehicles involved in the case. The jury decided that, under the pre-1977 definition, Western's vehicles, with one exception, were taxable, and that all of the vehicles were taxable under the 1977 definition. The district court, despite the jury verdict, entered judgment for Western as to all the vehicles and all the periods involved in that case. The Government appealed.

The decision of the Court of Appeals for the Fifth Circuit in *Western* upheld the validity of the 1977 administrative definition of "highway vehicle" for prospective

application, against an attack by Western; held that the district court erred in ignoring the jury verdict with respect to the taxability of Western's vehicles after the promulgation of the new definition in January 1977; and remanded the case to the district court for the entry of judgment in favor of the Government as to the 1977 taxes. The appellate court let stand the district court's judgment with respect to the non-taxability of Western's vehicles for the periods before the promulgation of the 1977 definition.

The Fifth Circuit's action in *Western* does not raise any question concerning—and, indeed, confirms—the non-taxability of Halliburton's units during the tax years beginning July 1, 1974, and July 1, 1975, and during the portion of the tax year beginning July 1, 1976, from that date until January 13, 1977.

Turning to the question of the taxability or non-taxability of Halliburton's units for the portion of the tax year 1976–77 subsequent to the promulgation of the new regulation on January 13, 1977, the 1977 regulation provided, in 26 C.F.R. § 48.4061(a)–1(d)(2), that certain "specially designed mobile machinery for non-transportation functions" were excepted from the definition of "highway vehicle" previously quoted. One of the exceptions was to the effect that:

> * * * A self-propelled vehicle * * * is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or operations similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment is unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (C) by reason of such special design, such chassis could not, with-

out substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

It appears that Halliburton's vehicles, under the portion of the 1977 regulation quoted in the preceding paragraph, were excepted from the 1977 definition of "highway vehicle" and, accordingly, were still exempt from the highway use tax after January 13, 1977.

The facts, as previously summarized, clearly show that Halliburton's equipment mounted on the chassis performed functions unrelated to transportation, that the operations performed by the equipment were similar to drilling, and that the equipment was permanently mounted, by welding or bolting, to the chassis.

In addition, the facts clearly show that Halliburton's chassis had been specially designed to serve only as a mobile carriage and mount for the equipment, and as a power source for the equipment.

It also appears that, by reason of the special design of Halliburton's chassis, it would have required substantial structural modification of any chassis in order for it to be used as a component of a vehicle suitable for performing the function of carrying a load other than Halliburton's equipment, or similar equipment. In order to use Halliburton's chassis for any transportation purpose other than the transportation of Halliburton's equipment, or similar equipment, it would have been necessary to remove from the chassis the special cross-members installed by the manufacturer at locations specified by Halliburton, and the over-rail cross-members and brackets installed by Halliburton, to accommodate its special equipment, and to add such cross-members as might be needed to make the chassis suitable for the intended new use. As the cross-members and brackets installed by the manufacturer and the over-rail cross-members and brackets installed by Halliburton added tortional strength to the chassis and

were integral parts of the unit as a whole, removal of such items would have constituted substantial modifications of the chassis in a structural sense.

Moreover, it would also have been necessary to remove from the chassis the other special components ordered by Halliburton and installed by the manufacturer to make the chassis suitable for use as mounts for Halliburton's equipment; to lengthen or shorten the chassis frame in order to make the chassis suitable for the transportation of another type of load; and to change the front or rear axles to axles with different capacities. These changes would undoubtedly have made the conversion of Halliburton's chassis infeasible from the economic standpoint.

Accordingly, even with respect to the period between January 13, 1977, and the end of the 1976–77 tax year, and notwithstanding the decision by the Fifth Circuit Court of Appeals in *Western Company of North America v. United States, supra,* Halliburton's units were not subject to the highway use tax.

### CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts as found by the court, the court concludes as a matter of law that the plaintiff is entitled to recover.

The amount of the plaintiff's recovery will be determined in subsequent proceedings under Rule 42(c).

IT IS SO ORDERED.

### SUPPLEMENTAL FINDINGS OF FACT

In addition to the facts stated in the opinion, the court makes the following explanatory findings of fact for the record:

1. Cementing is done on newly drilled wells to bond the surface casing with the exterior of the drill hole, and cementing is done on newly completed oil and gas wells to bond the entire casing pipe used to line the well with the exterior of the drilled hole. A cementing job performed in relation to workovers on existing wells usually involves the repair of deteriorated cement and/or the closing off of a non-producing zone to enable the recompletion of the well in a new zone. Cement is mixed according to the specifications of the engineer in charge of the well, and is pumped into the hole under pressure. Cementing jobs are extremely time critical, and the unit must be properly positioned at the well site, regardless of the conditions there, at the time the operator of the well is ready to have the job performed.

2. (a) Stimulation services are related to both new well completions and the workover of existing wells, with the objective of increasing the well's production. Stimulation is performed in one of two ways—acidizing or fracturing.

(b) Acidizing involves pumping at high pressures a diluted solution of acid into the formation to dissolve tiny channels in the rock. This allows more oil and gas to flow to the well.

(c) Fracturing involves the pumping of pressurized fluids containing proppants, which literally cracks the productive formation. The fissures are kept open by proppants, such as sand, which are mixed with the fluid and carried into the cracks. When the pressure is removed, the proppants remain in the cracks to hold the fissures open and to allow the oil and gas to flow to the well more readily.

3. Halliburton, through its Welex division, provides electric well logging and perforating services for the petroleum industry. Electric logging is used to provide a profile of the geologic structures from which an operator is able to identify the formations in a well in which oil or gas might be found. Perforating opens passages through a well's steel casing and cement, so that the oil or gas can flow from the formation into the well. The electric logging unit lowers a tool on the end of a cable into the hole, and allows the performance of its function (either logging or perforating) through the use of sophisticated electronic equipment in the unit at the well site.

4. The equipment used on a cementing job includes a single HT 400 cementing unit or a twin HT 400 cementing unit, each of which is a pumping unit designed to pump cement that bonds the well casing to the rock down the hole. In an acidizing job, the equipment includes one or more of: a single HT 400 acid pumping unit; a single HT 400 acid pumping unit with low pressure cement mixing equipment; or a single HT 400 acid pumping unit with RCM cement mixing equipment. The acid is pumped down the hole at high pressure and dissolves limestone to enlarge flow channels, thus increasing production. Fracturing (or "frac") jobs require one or more twin HT 400 fracturing units having high pressure pumps used to force the sand and water mixture down the well and into the formation, plus a 50-barrel per minute blender or a 100-barrel per minute blender, or a single HT 400 25-barrel per minute combination acid and blender unit. The blenders mix the "frac" fluid which the pumping units pump into the well. For its well logging and perforating functions, Welex utilizes a vehicle with sophisticated computer equipment on board, and a reel holding the cable to which the tools will be attached.

5. (a) Structurally and functionally, a truck chassis consists of four general major component groups—the frame, the drive system, the suspension system, and the cab.

(b) The frame consists of two rails, which run parallel to each other from the front of the vehicle to the rear. In the front, the front suspension and the engine are bolted to the frame. The cab covers the engine. Behind the cab, the frame is fully exposed on the top side. Near the rear of the frame, there are two sets of wheels and axles, and the differential, which powers the wheels. This area is called the bogey and the wheels are attached to the frame by means of the rear suspension. At various points along the frame, the individual rails are connected by cross-members. The cross-members perform the function of maintaining the parallelogram of the frame. Cross-members, or something performing the equivalent function, are located in the front of the frame, at the bellhousing near the rear of the engine mounts, at the bogey area, at the rear of the frame, and other areas as required.

(c) The suspension system is the coordinator between the wheels-and-axles combination and the frame. There is a suspension system in the front for the steering axle and a suspension system in the rear, or bogey, area for the driving wheels. The function of the suspension system is to absorb and lessen the vibrations and forces transferred to or on the frame as a result of the physical movement of the vehicle.

(d) The drive train is that portion of the chassis which takes the torque created by the engine and transfers it to the driving wheels in the rear. It consists of the engine (which includes the cooling system), transmission(s), and differential. A transmission transfers the torque from the engine to the differential, which, in turn, causes the axle to rotate and thus drives the wheels.

6. (a) Each of the plaintiff's vehicles in issue conformed to the federal laws (Department of Transportation and Occupational Safety and Health Administration of the Department of Labor) and state laws. This included the vehicle's lights and lighting accessories, back-up alarm, height, weight, length, and width. No special permits were required for the vehicles to travel over the public roads.

(b) It would be cost-prohibitive for the plaintiff to utilize a unit in its cementing, blending, acidizing, fracturing, or well logging operations that did not comply with state laws governing the use of the public roads without special permit (e.g., laws such as those governing the length, height, width, and weight).

7. The acid pump unit, while it has the ability to carry up to 1500 gallons of acid, is primarily designed as a pumping unit, and in most cases, the acid it carriers is not sufficient to perform the usual acid job.

8. On one occasion, the plaintiff found itself possessed of new surplus vehicles, and it attempted over a period of several months in 1982 to sell those chassis, as

received from the manufacturer, to any other user, but was unable to do so.

9. Halliburton has been able in past auctions to sell some of its used chassis after the equipment has been removed, for an average price of from 5 percent to 10 percent of its original cost.

10. The plaintiff concedes that it is liable for the highway use tax with respect to unit numbers 8783, 0539, 0109, 0180, 0181, 0410.

11. The plaintiff's claims for refund for the periods from July 1, 1974, to June 30, 1975, from July 1, 1975, to June 30, 1976, and from July 1, 1976, to June 30, 1977, stated in part as follows:

Halliburton Company paid highway use tax during the period * * * [period stated] * * * on certain vehicles used in its oilfield service business which are not highway vehicles as defined by Regulations 41.4482(a)–1 and 48.4061(a)–1(d).

These vehicles are used to perform such services as cementing, fracturing, acidizing, and well logging of oil wells.

These vehicles are not highway vehicles for the following reasons:

1. Machinery and equipment is permanently mounted on the chassis. Such machinery and equipment is used to perform services necessary for drilling oil wells and producing oil and gas.

2. The chassis serves only as a mobile carriage for the machinery and equipment and has been specially modified, so the machinery and equipment can be mounted on it.

3. Due to the special designs, the chassis could not serve as a component of a vehicle designed to perform a function of transporting any load other than the intended machinery and equipment without substantial structural modifications.

12. The vehicles in issue were kept at district offices of the plaintiff for use in servicing oil and gas wells. The district offices are physically located in such a manner so that each office will service an operating area. The radius of the largest area is approximately 200 to 250 miles.

13. In the Shreveport Division, units traveled the following number of miles for 1981:

| Unit No. | Miles |
|----------|--------|
| 0265 | 11,094 |
| 0634 | 21,513 |
| 0808 | 11,564 |
| 0893 | 12,513 |
| 9950 | 19,244 |