## HALLIBURTON COMPANY

v.

### The UNITED STATES of America.

**Civ. A. Nos. 4–82–191–E, 4–82–300–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

April 23, 1985.

Daniel L. Penner, Fort Worth, Tex., for plaintiff.

William W. Guild, Michael E. Green, U.S. Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## MEMORANDUM OPINION

MAHON, District Judge.

Plaintiffs Halliburton Company and Otis Engineering Corporation brought separate refund suits in this Court for manufacturer's excise taxes and interest alleged to be illegally and erroneously assessed by the defendant and paid by Plaintiff Halliburton in the amount of $143,261.85 [1] and by Plain-

---

1. The periods for which Halliburton claims refunds are the quarters beginning January 1, 1976 and April 1, 1977.

tiff Otis in the amount of $6,604.00 [2] on certain trucks and trailers used by them. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1346(a)(1) and venue is proper in the Northern District of Texas. The cases have been consolidated for trial and were tried before the Court on October 1, 2, 3, and 4, 1984. This Memorandum Opinion is based on evidence presented at trial and the briefs and arguments of counsel and is submitted in lieu of findings of fact and conclusions of law. The sole issue to be decided is whether the various vehicles in issue are "highway vehicles" subject to the manufacturer's excise tax imposed by Section 4061 of the Internal Revenue Code of 1954, 26 U.S.C. § 4061.

Halliburton and Otis are each duly organized and existing corporations with their principal offices in Dallas, Texas and with district offices located in oil and gas producing areas of Texas and other states. They are in the business of providing specialized services utilized in drilling and operating oil and gas wells.

Halliburton's services relevant to this action consist principally of cementing,[3] acidizing,[4] fracturing,[5] logging,[6] and perforating [7] oil and gas wells at the well site. Otis provides sophisticated electric and non-electric wirelines services for the petroleum industry, by which a variety of jobs are done from the end of a cable (wireline) lowered into the well hole. Both Halliburton's and Otis' oil field servicing equipment is mounted on a truck or trailer chassis in order to provide mobility for the equipment, thus enabling it to be moved to each well site and connected to the well head to be serviced.

The equipment used on a cementing job includes a single HT 400 cementing unit or a twin HT 400 cementing unit, each of which is a pumping unit designed to pump cement that bonds the well casing to the rock down the hole. In an acidizing job, the equipment includes one or more of: a single HT 400 acid pumping unit; a single HT 400 acid pumping unit with low pressure cement mixing equipment; or a single HT 400 acid pumping unit with RCM cement mixing equipment. The acid is pumped down the hole at high pressure and dissolves limestone to enlarge flow channels, thus increasing production. Fracturing, or "frac" jobs require one or more twin HT 400 fracturing units having high pressure pumps, used to force the sand and water mixture down the well and into the formation, and a blender. The blenders mix the "frac" fluid which the pumping unit pumps into the well. For its wireline functions, Otis utilizes a vehicle with sophisticated monitoring equipment on board, and a reel holding the cable to which the tools will be attached. The cement, acidizer, frac unit and blender may be either a bodyload straight truck unit or a tractor-trailer combination unit. Otis' wireline units are all body load units.

2. The periods for which Otis claims refunds are the quarters beginning January 1 and April 1, 1978.

3. Cementing is a process of pumping cement at high pressure into the space between the well casing and the wall of the hole, thereby bonding the casing to the rock.

4. Acidizing is a stimulation treatment applied to new or reworked wells after completion in a producing formation to increase the amount of oil or gas coming into the well. In acidizing, a solution of 15% hydrochloric acid is pumped into a well to dissolve tiny channels in the rock, thereby increasing its permeability and stimulating a greater flow of oil or gas into the well.

5. Fracturing is also a stimulation service applied to both new well completions and the

workover of existing wells to increase the wells production. Fracturing involves the pumping of pressurized fluids mixed with sand into the well. The pressure forces open fractures in the reservoir rocks, thereby permitting a greater amount of oil or gas to reach the well.

6. Logging is the process of accumulating liquids in the well bore of gas wells thereby preventing gas from rising to the surface.

7. Perforation is the making of holes in the casing and cement (if present) to allow formation fluids to enter the well bore. One common method of perforating is by shooting pellets through the casing by means of a special gun lowered into the hole.

Halliburton's units in issue in this case are as follows: (1) Acid Truck; (2) M–50 Blender Truck; (3) Cementing Truck Model 75C3; (4) Cementing Trailer; (5) Fracturing Trailer; (6) Blender Trailer; and (7) Manifold Head Trailer.[8] The Acid Truck and M–50 Blender Truck are built on a Model 4070 International Harvester chassis. The Cementing Truck is built on a Model WS 726 LST Mack Chassis. The trailers are all on chassis designed by Halliburton. The Otis units in issue in this case are either built on a Model F–600 Ford Truck or a Model S–1750 International Harvester Truck.

Because this case requires an examination of the nuts and bolts of the chassis upon which plaintiffs' equipment is mounted, it is important to understand the basic framework and operation of these chassis. Structurally and functionally, the chassis consist of four general major component groups—the frame, the drive system, the suspension system, and the cab. The frame consists of two rails, which run parallel to each other from the front of the vehicle to the rear. In the front, the front suspension and the engine are bolted to the frame. The cab covers the engine. Behind the cab, the frame is fully exposed on the top side. Near the rear of the frame, there are two sets of wheels and axles, and the differential, which powers the wheels. This area is called the bogey and the wheels are attached to the frame by means of the rear suspension. At various points along the frame, the individual rails are connected by cross-members. The cross-members perform the function of maintaining the parallelogram of the frame. Cross-members, or something performing the equivalent function, are located in the front of the frame, at the bellhousing near the rear of the engine mounts, at the bogey area, at the rear of the frame, and other areas as required.

The suspension system is the coordinator between the wheels-and-axles combination and the frame. There is a suspension system in the front for the steering axle and a suspension system in the rear, or bogey, area for the driving wheels. The function of the suspension system is to absorb and lessen the vibrations and forces transferred to or on the frame as a result of the physical movement of the vehicle. The drive train is that portion of the chassis which takes the torque created by the engine and transfers it to the driving wheels in the rear. It consists of the engine (which includes the cooling system), transmission(s), and differential. A transmission transfers the torque from the engine to the differential, which, in turn, causes the axle to rotate and thus drives the wheels.

Plaintiffs use the public highways as necessary to move their equipment to the well site or to return to the local office pending the next assignment. The units travel over public highways at an average speed of 30–35 miles per hour although the units are capable of traveling at a maximum speed of 55 miles per hour. Some of the well sites are remotely situated and can be reached only by traveling substantial distances on private roads and off public highways which are often difficult to traverse without specially designed equipment. Approximately ⅔ of the units' time is spent at jobsites and ⅓ is spent in transit. Of the total transit time, ⅓ is spent on the highway and ⅔ is spent on private roads. The average distance to and from a well site is 90 miles round trip with a significant portion of the distance traveled on public highways. Although the chassis engine is necessary for the operation of the deck equipment on each of plaintiffs' units, the deck equipment does not interfere with the operation of the chassis engine on the public highways.[9] Neither Halliburton nor Otis hires professional truck drivers to drive the equipment; rather, the truck driver is

---

8. Defendant conceded before trial that Halliburton's 1400 Cubic Foot Pneumatic Field Storage Trailers are exempt from the manufacturer's excise tax.

9. It is important to note that the chassis cannot be moving while the deck equipment is in operation. This will be discussed later in the opinion.

trained to operate the equipment at the well site.

While the terrain of a typical job may be relatively flat, the equipment is ruggedly constructed in order to meet the exigencies of the extreme conditions of poor lease roads, board roads and mud. In many cases, it is required that the mobile equipment be positioned at the well site by the use of tracked vehicles such as caterpillar equipment. Such positioning is done by either pushing or pulling the unit with a caterpillar from front to rear or rear to front, or, in some instances, by shoving the equipment from side to side. However, the well operator is responsible for providing access roads from the highway to the well site.

Halliburton and Otis each have engineering departments whose function it is to study and develop equipment features necessary to perform most economically and effectively the services rendered by each. The departments are primarily concerned with the special performance of the equipment mounted on the chassis, with the chassis being designed and built by International Harvester, Mack Truck and Ford Motor Company to both Halliburton and Otis' specifications. The chassis, including the special components specified by plaintiffs to accommodate the special needs of their equipment, are delivered to plaintiffs in bare form. Plaintiffs complete the chassis by bolting to the frame the necessary side mounted items, brackets, subframes and additional members, including over-rail cross-members, to be used as equipment mounts. The machinery and well servicing equipment are then bolted and welded to these items.

While plaintiffs' units do use the highway regularly, the units are primarily designed as off-highway vehicles and are predominantly used for an off-highway function. As such, plaintiffs' engineers select the components for a chassis in conjunction with representatives of the chassis manufacturer and the ultimate design incorporates the compromise necessary to satisfy the requisites of highway driving, and off-road use. This is evidenced by the fact that the units are designed to travel on the highway without a special permit, thus avoiding the delays and travel restrictions imposed on the movement of special equipment requiring a special permit.

Many of these chassis components are considered "special" by plaintiffs simply because plaintiffs ordered them but reflect nothing more than customer preference and are found on most heavy duty trucks. Among these standard options are frame supports and cross-member reinforcements, heavy duty bumpers, walking beam suspensions, power take-off units and maximum cooling radiators. Nevertheless these features do make the units heavier and more costly to operate than exclusively highway units.

There are however some components that are indeed special and unique to plaintiffs chassis. The engine is mounted at zero degrees instead of the standard 3–4 degrees. This requires different mounting brackets as well as different fan shrouds, dip stick, exhaust system, air intake system, transmission rear mount and line drive system. This special mount is necessary for the operation of the equipment mounted on the deck. Thus, the deck equipment can only be utilized when the unit is not moving. Most of plaintiffs units are equipped with special transmissions, providing high torque at low speeds as well as the range necessary for highway travel, and special tires, enabling the units to compromise between high traction and damage resistance of all-terrain tires and good service on the highway without overheating at high speeds of normal highway tires. A special speed governor permits the vehicles to travel at a maximum highway speed of 55 miles per hour with an average highway speed of 30–35 miles per hour.[10] The wheel bases of Halliburton's body load

---

**10.** While 55 mph is the legal speed limit, it is not the normal speed of traffic. Testimony at trial revealed that speeds of 70–80 mph are the rule rather than the exception. Thus, from an economic standpoint, plaintiffs' chassis are too slow to be profitable as long distance carriers.

chassis are unusually long, ranging from 210"–219". The standard wheel base is less than 200" [11]. The Otis units have special transfer cases as opposed to standard optional power take-offs, installed in the drive line, enabling it to transfer power from the trucks drive train to a hydraulic pump. This requires full torque and makes the chassis more costly than the use of a standard optional power take-off.[12]

Plaintiffs' chassis are considerably more expensive to acquire and maintain than similar model chassis designed for highway application. The average price of one of plaintiffs' truck and trailer chassis as received from the manufacture was approximately $55,000.00 and $25,000.00 respectively. This represents roughly 10–25% of the total cost of one of plaintiffs completed units.[13] The average price of a regular up and down highway truck and trailer chassis as received from the manufacturer is approximately $35,000.00 and $12,000.00 respectively. Furthermore, the average chassis engine life of plaintiffs' units are 35,000–40,000 miles due to off-road services. The expected engine life of a chassis engine in an over the highway application is 200,000–300,000 miles. The average life of plaintiffs' transmissions are also substantially less than that expected for highway application.

The peculiar characteristics of plaintiffs' units substantially limit or impair in some way their ability to carry a load on the public highways in terms of speed and in terms of economy of acquisition and operation. There are, however, many trucking applications which require a chassis design which is suitable for operation over the same road conditions as a chassis used for oil well service vehicles. Other vocations such as construction, logging, mining, and agriculture require vehicles to be durable under severe conditions. Nevertheless, the chassis in issue, as modified, are specially designed for use as mobile mounts for oil well service equipment and an expert not familiar with oil field equipment would probably not be able to identify any particular use for the chassis just by examining the bare chassis.

In order to use the Halliburton chassis as components for other vehicles performing other applications, it would be necessary to remove all of the deck mounting over rail cross-members and brackets (subframe) and add in-frame cross-members where necessary. The air and fuel tanks and body boxes may have to be relocated. The zero degree engine angle would not necessarily impair the operation of the truck on the highway and would not have to be modified unless the wheel base had to be shortened.[14] Nevertheless, the standard engine mount is preferable. The transfer case for a power take-off is mounted in the drive line a few feet behind the transmission. In some units, the transfer unit is mounted upside down, sticking up about 16 inches above the frame rails, and in others, protruding a few inches above the frame rails. The removal of the transfer case, if necessary, would require a new drive line and drive-line carrier bearing as well as an additional cross-member. However, a transfer case might enhance the utility of the chassis for other vocations requiring a high torque power take-off, and in such a case, would not have to be removed.

11. Given the long wheel base required by Halliburton for its servicing equipment, Halliburton requires that its truck chassis be cabover as opposed to conventional trucks. Cabover trucks have the cab mounted over the engine whereas conventional trucks have the cab mounted behind the engine. A cabover truck is designed to have a shorter length for the same load space than a conventional truck and are more expensive than conventional trucks. However, even with the cabover, Halliburton's trucks require a 100 fee minimum turning diameter. This large turning diameter poses an obstacle to many vocations that can only be overcome by shortening the wheel base.

12. For example, the Foote Brothers transfer case utilized by plaintiffs costs approximately $10,000 whereas a standard option power take-off costs approximately $300.

13. The price of one of plaintiffs' completed units ranged from approximately $200,000.00—$500,000.00.

14. *See supra* at n. 11.

Halliburton trailers are lowboy trailers, 30 feet in length. The throat section extends back about 10 feet from the front of the trailer, where the kingpin is located.[15] The trailer frame rails are tied together by both in-frame and over-rail cross-members. Halliburton mounts its equipment on these trailers by installing brackets and subframes for the equipment. Without these brackets and subframes, the frame rail configuration resembles that of Halliburton's truck chassis and can be used as a flat-bed trailer to carry heavy loads. In installing a flat bed, the structural support provided by the subframes for the oil well servicing equipment would be replaced by the subframe of the flat bed or by cross-members. However, it would not be economically feasible to utilize one of Halliburton's trailers as a flat bed. As stated earlier, the cost of plaintiffs' trailer was approximately $25,000.00 whereas a purchaser of a highway use vehicle requiring similar capabilities and capacities would pay no more than $12,000 for a trailer to do the job.

The Halliburton manifold head trailer in issue has a simple frame rail mounted on a rear suspension. Piping is attached to the frame rail and is used to make the appropriate connection at the jobsite. The single rail slopes downward at a rather sharp angle and makes the trailer unfit to haul large loads because the load would either drag on the ground or slide off the back.

In order to use the Otis units prior to its equipment being installed as a component of another vehicle performing another application it would be necessary to remove the drive line, transfer case and mounting brackets and add a new drive line and cross-members where necessary. The mounting brackets also serve as cross-members. The full torque split-shaft gear box used by the Otis units are integrally mounted in the frame and drive train and would also have to be removed. The air

and fuel tanks and battery boxes may have to be relocated. The wireline units have a reel mounted on the frame rails by means of brackets. A body is also mounted on the frame rails, enclosing the wireline equipment. To remove the mounting brackets would require removing the body and reel by cutting the frame at the rear and moving the heavy duty bumpers.

Section 4061 of the Internal Revenue Code imposed a manufacturer's excise tax on certain truck and trailer chassis. This section was repealed effective April 1, 1983. Prior to April 1, 1983, a 10% manufacturer's tax applied to sales of automobile trucks and trailers having a gross vehicle weight over 10,000 pounds. Effective April 1, 1983, the tax was converted to a 12% retail tax under Section 4051 on trucks and trailers with a gross vehicle weight over 33,000 pounds and 26,000 pounds respectively. Nevertheless, because the taxable years in issue are 1976–78, the issue of plaintiffs' tax liability must be examined under Section 4061.

Congress created the Highway Trust Fund in 1956, under Section 209 of the Highway Revenue Act of 1956. Section 209 of the Act of June 29, 1956, c. 462, set out as a note under 23 U.S.C. § 120. Section 209(c) provided that certain excise taxes related to highway vehicles, including the manufacturers excise taxes under Section 4061, would be appropriated to the Highway Trust Fund.[16] The regulation relevant to this case is Treas.Reg. on Manufacturers and Retailers Excise Tax, 26 C.F.R. § 48.4061(a)–1. Sections 48.4061(a)–1(a)(2) and (e)(2)(i) provide that a truck or trailer chassis which is sold as part of a completed vehicle is taxable under section 4061(a)(1) if the vehicle is a "highway vehicle." The sole issue in this case is whether plaintiffs' units are "highway vehicles" and thus taxable under Section 4061(a)(1).

---

**15.** The kingpin is the piece which connects the trailer to the fifth-wheel of the truck-tractor which turns the trailer. The truck-tractors are not in issue here.

**16.** In 1983, Congress enacted a new Highway Trust Fund, 26 U.S.C. § 9503, and intended that it be treated for all purposes, including the manufacturer's excise tax, as a continuation of the old Highway Trust Fund established by Section 209. *See* note under Section 9503.

Plaintiffs contend that their units are exempt from the tax under a long-standing interpretation of the term "highway vehicle." Under that interpretation, "vehicles are not taxable if 'primarily designed' or 'predominantly adapted' for use as nonhighway vehicles even though incidental highway use may occur." *Western Co. of North America v. United States*, 699 F.2d 264 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 237, 78 L.Ed.2d 228, *reh'g. denied*, —— U.S. ——, 104 S.Ct. 517, 78 L.Ed.2d 703 (1983) (citations omitted). In applying this standard, numerous courts have found that oil well servicing vehicles were not taxable "because their design had been controlled by the demands of their specialized functions and off-road usage." *Id. See Big Three Industrial Gas & Equipment Co. v. United States*, 329 F.Supp. 1273 (S.D.Tex.1971) *aff'd per curiam* 459 F.2d 1042 (5th Cir.1972); *Otis Engineering Corp. v. United States*, 376 F.Supp. 109 (N.D.Tex.1974); *Stafford Well Service, Inc. v. United States*, 340 F.Supp. 657 (D.Wyo.1972).

The government denies that the vehicles are exempt under this standard. Furthermore, the government contends that all prior interpretations of "highway vehicle" have been superseded by the definition of "highway vehicle" contained in the treasury regulation promulgated January 13, 1977, Treas.Reg. on Manufacturers and Retailers Excise Tax, 26 C.F.R. § 48.4061(a)–1. The 1977 regulations define "highway vehicle" as "any self-propelled vehicle, or any trailer or semi-trailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions." 26 C.F.R. § 48.4061(a)–1(d).[17] There are however, three exemptions from this seemingly all-encompassing definition. The first exemption (mobile machinery exemption) provides a three-part test and is set forth in Section 48.4061(a)–1(d)(2)(i). The test provides that a self-propelled vehicle, or trailer or semi-trailer, is not a highway vehicle if it:

(A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling timbering, or operation similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment or equipment is unrelated to transportation on or off the public highways,

(B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery

17. The full definition of "highway vehicle" is set out in Section 48.4061(a)–1(d)(1), which states:

(d) *Highway vehicle—(1) Definition.*
For purposes of this subchapter, the term "highway vehicle" means any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions, but does not include a vehicle described in paragraph (d)(2) of this section. For purposes of this definition, a vehicle consists of a chassis, or a chassis and a body if the vehicle has a body, but does not include the vehicle's load. Therefore, in determining whether a vehicle is a "highway vehicle," it is immaterial that the vehicle is designed to perform a highway transportation function for only a particular kind of load, such as passengers, furnishings and personal effects (as in a house, office, or utility trailer), a special type of cargo, goods, supplies, or materials, or, except to the extent otherwise provided in paragraph (d)(2)(i) of this section, machinery or equipment specially designed to perform some off-highway task unrelated to highway transportation. In the case of specially designed machinery or equipment, it is also immaterial, except as provided in paragraph (d)(2)(i) of this section, that such machinery or equipment is permanently mounted on the vehicle. For purposes of paragraph (d) of this section, the term "transport" includes the term "tow," and the term "public highway" includes any road (whether a Federal highway, State highway, city street, or otherwise) in the United States which is not a private roadway. A vehicle which is not a highway vehicle within the meaning of this paragraph shall be treated as a nonhighway vehicle for purposes of this subchapter. Examples of vehicles that are designed to perform a function of transporting a load over the public highways are passenger automobiles, motorcycles, buses, and highway-type trucks, truck tractors, trailers, and semi-trailers.

or equipment involved, whether or not such machinery or equipment is in operation, and

(C) by reason of such special design, such chassis could not without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

The Regulations require that all three parts as defined in subparagraphs (A), (B) and (C) be met. The government has conceded that subparagraph (A) is met by all units in the case, except for the Acid Trucks. It is the contention of the government that the Acid Trucks be considered under the second exemption.

The second exemption (off highway transportation) provides a two-part test and is set forth in Section 48.4061(a)–1(d)(2)(ii). This test provides that a self-propelled vehicle, or trailer or semi-trailer, is not a highway vehicle if it is:

(A) specially designed for the primary function of transporting a particular type of load other than over the public highway in connection with a construction, manufacturing, processing, farming, mining, drilling, timbering, or operation similar to any one of the foregoing enumerated operations, and

(B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired. For purposes of applying the rule of (B) of this subdivision, account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for reg-

ular use, and any other relevant considerations. Solely for purposes of determinations under this paragraph (d)(2)(ii), where there is affixed to the vehicle equipment used for loading unloading, storing, vending, handling, processing, preserving, or otherwise caring for a load transported by the vehicle over the public highways, the functions are related to the transportation of a load over the public highways even though such functions may be performed off the public highways.[18]

Plaintiffs claim that the 1977 regulation is invalid because the long-standing "primary design" test had attained the force of law through implicit Congressional approval by amendment and re-enactment of the manufacturer's excise tax. Alternatively, plaintiffs claim that even if the 1977 regulation applies, their vehicles are exempt from taxation under the two exemptions set forth above.

Plaintiffs' first argument is based on the history and judicial interpretation of the term "highway vehicle" as used in Section 4061(a). From the time of its enactment in 1917 until the 1977 regulation, the manufacturer's excise tax law was amended and reenacted 27 times. *See* plaintiffs' trial brief at appendix B. During this period, the regulations had consistently construed the tax to reach only those vehicles designed primarily for highway transportation. Plaintiffs claim that Congress was aware of this interpretation throughout the course of amending the manufacturers excise tax and that failure on the part of Congress to modify the definition constitutes incorporating the primary design test into law. As such, plaintiffs maintain that the primary design test is the operative standard for determining whether a vehicle is a "highway vehicle" and the IRS cannot

---

**18.** A third exemption, which is not at issue here, is set forth in Section 48.4061(a)–1(d)(2)(iii) and provides that trailers or semi-trailers are not highway vehicles if they are:

specially designed to serve no purpose other than providing an enclosed stationary shelter for the carrying on of a function which is directly connected with and necessary to, and

at the off-highway site of, a construction, manufacturing, processing, mining, drilling, farming, timbering, or operation similar to any one of the foregoing enumerated operations such as a trailer specially designed to serve as an office for such an operation. Thus, no further discussion will be given to this exemption.

modify this standard without first presenting an adequate basis and explanation for rescinding the prior standard which it did not do. *See Motor Vehicle Manufacturers Assns. of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The Court does not agree. In *Western Co.*, the Fifth Circuit had before it the validity of the 1977 regulation's definition of highway vehicle as it pertained to the special fuels tax, 26 U.S.C. § 4041(a) and the highway use tax, 26 U.S.C. § 4482(a). Western Co. contended that the definition as applied in these statutes incorporated the primary-design test employed in the manufacture's excise tax. The Court held, however, that "there was nothing in the sparse legislative history of the amendments or re-enactments of the *three statutes* to indicate that Congress had considered and approved any particular interpretation of [highway vehicle.]." 699 F.2d at 270 (emphasis added). The Court further stated that if "Congress had considered and approved the primary design standard as an accurate assessment of its intended incidence of taxation under all three statutes" then the primary design test would have the effect of law and the 1977 regulation would be invalid. *Id.* at 275 (citations omitted). However, Western Company conceded that there was no evidence of any express Congressional approval of the primary design standard under any of the statutes. *Id.*

The validity of the primary design test in resolving a manufacturer's excise tax question following the promulgation of the 1977 regulation was not before the Court in *Western Co.* In a footnote, the Court stated that Section 4061(a)'s definition of "highway vehicle" does not control interpretations of that term under Sections 4041(a) and 4482(a). *Id.* at 275 n. 12. This point was made in response to a suggestion by Western Co. that the Court follow as precedent the decision in *Big Three Industrial Gas & Equip. Co. v. United States*, 329 F.Supp. 1273 (S.D.Tex.1971) *aff'd on district court opinion*, 459 F.2d 1042 (5th Cir.1972). In *Big Three*, the Court applied the primary design test to find that the vehicles in issue were not highway vehicles and thus not subject to the manufacturer's excise tax. This decision, however, came before the 1977 regulation and was based on Rev.Rul. 57–440, 1957–2 C.B. 721. *See* 329 F.Supp. at 1277. Thus, such a ruling does not constitute a binding judicial interpretation of "highway vehicle," precluding administrative modification of the definition.

Although not controlling, the Court finds the holding and reasoning in *Western Co.* persuasive to a disposition of the issue presently before the Court. The Fifth Circuit specifically referred to the legislative history of the manufacturers excise tax when it stated that Congress had neither considered nor approved any particular interpretation of highway vehicle. As in *Western Co.*, the plaintiffs here have not been able to offer any evidence to refute this statement.

The 1977 regulation was designed "to clarify the definition of 'highway vehicle' and to apply such definition uniformly for purposes of various sections of the Internal Revenue Code of 1954." T.D. 7461. 1077–1 C.B. 317. It would be inconsistent with the spirit of the regulation to say that the primary design standard has attained the effect of law as to one section of the Code and not as for another section. *Western Co.* made it perfectly clear that the new regulation's definition of "highway vehicle" supersedes all prior interpretations of that term as it relates to the special fuel and highway use taxes. As stated earlier, there is no evidence that Congress ever considered or approved the primary design standard.

■ Pursuant to 26 U.S.C. § 7805(a), the Treasury Department is authorized to promulgate regulations interpreting a statute. The Courts role in determining the validity of a Treasury regulation is to ascertain whether the regulation interprets the statute in a reasonable manner and a treasury regulation is "not invalid simply

because the statutory language will support a contrary interpretation." *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24–26, 102 S.Ct. 821, 827–828, 70 L.Ed.2d 792 (1981). The purpose of the manufacturer's excise tax is to make heavy truck highway users share the cost of the highways. Treas.Reg. 48.4061(a)–1 and the definition of "highway vehicle" contained therein are designed to implement that goal. As such, Treas.Reg. 48.4061(a)–1 is a reasonable interpretation of the underlying statute and has the force and effect of law.[19] *See United States v. Cork*, 494 F.2d 573, 574 (5th Cir.1974). Accordingly, the Court holds that all prior interpretations of "highway vehicle" as they relate to Section 4061(a), have been superseded by the definition contained in the 1977 regulation.

Under the 1977 regulation, the new definition of highway vehicle was to apply retroactively. However, if any rules existing prior to January 13, 1977 "unequivocally resolve an issue involving the definition of highway vehicle," then, at the taxpayers' option, such existing rules will apply to resolve the issue prior to such date. 26 C.F.R. § 48–4061(a)–1(d)(3); *see also Western Co.*, 699 F.2d at 267 n. 4. The Court finds that the primary design test unequivocally resolved the issue of interpreting the definition of highway vehicle under the manufacturer's excise tax prior to January 13, 1977, and should apply to Halliburton's claim for refund for the quarterly period beginning January 1, 1976.[20]

■ Under this standard, the Court finds that Halliburton's units in question are not "highway vehicles." Those units are primarily designed and constructed for use in the oil fields and other off-highway industrial jobsites. Although these units use the highway as necessary to get to the jobsites, this use is incidental to their intended function. Therefore, the Court holds that these units are not subject to the manufacturer's excise tax and that Halliburton is entitled to a refund for overpaid taxes for the period January 1—March 31, 1976.

The Court must now determine whether plaintiffs' vehicles are exempt from the new definition of "highway vehicles" contained in the 1977 regulation.[21] Plaintiffs claim that their units are exempt under the mobile machinery exemption, a three part test which provides that in order to be exempt from the definition of a highway vehicle, a unit must: (1) consist of a chassis to which there is permanently mounted, by welding or bolting, specialized machinery for oil well servicing equipment; (2) the chassis has been specially designed to serve only as a mobile carriage and meant for such machinery; and (3) by reason of such design, the chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that or similar equipment. 26 C.F.R. § 48.4061(a)–1(d)(2)(i). Plaintiffs rely on *Halliburton Company v. United States*, 4 Cl.Ct. 150 (1983), where the United States Claims Court found units identical to those at issue here to be exempt from the manufacturers excise tax under the three-part test.[22] This decision, however, is not binding on this Court and does not relieve the Court of its obligation to apply the three-part test to the facts at hand and make an independent determination.

As mentioned earlier, the government has conceded that all of plaintiffs' units

---

**19.** Congress has since restructured the tax in issue without challenging the definition of "highway vehicle" contained in the regulation. *See supra* at pp. 1122–1123.

**20.** Although Halliburton did not directly elect to have the prior rules apply to its pre-1977 refund claim, the Court finds that by arguing that the primary design test has attained the force of law and that the 1977 regulation is invalid, Halliburton has impliedly made such an election.

**21.** It is clear that plaintiffs' units are "highway vehicles" as defined in the regulation.

**22.** The units at issue in the Claims Court case were those of Halliburton and its subsidiary, Welex. The Halliburton units are identical to those presently before this Court. The Welex units are substantially identical to and perform similar functions at the jobsite as the Otis units involved in this action.

except for Halliburton's Acid Trucks meet the first part of the three-part test, i.e., the units consist of a chassis to which there is permanently mounted specialized oil well servicing equipment. The government contends that the Acid Trucks should be considered under the off highway transportation exemption relating to a transportation of a load, rather than a non-transportation function of serving only as a mobile mount for machinery, because they are capable of carrying 1500 gallons of acid. These units, while they do have the ability to carry up to 1500 gallons of acid, are primarily designed as a pumping unit, with the pumps mounted on the chassis to provide mobility to the equipment. This is evidenced by the fact that in most cases, the acid these units carry is not sufficient to perform the job. Therefore, as with all the other units in issue, the Acid Trucks will be considered under the three-part exemption.

The Court finds that these chassis have been specially designed to serve only as mobile carriages and mounts for plaintiffs' equipment. The structural additions to the chassis are specially ordered from the manufacturer so that plaintiffs' units can withstand the extreme conditions encountered in the fields and are necessary for plaintiffs' units to perform their respective services at the jobsite.[23] The special zero degree engine mount, transmission and tires as well as the frame supports, cross-member reenforcements, walking beam suspensions, power take-offs and unusually long wheel-bases, adapt the chassis to the weight distribution and operating characteristics of each of plaintiffs' units and make the chassis an integral part of the completed unit.

The special nature of plaintiffs' units is strongly evidenced by the fact that in 1982, Halliburton found itself with a surplus of approximately 200 specially ordered chassis. Halliburton tried to sell these chassis in bare form as received from the manufacturer, but was unable to do so because no one was willing to pay the higher price for a Halliburton chassis when they could get another chassis without all the special components to satisfy their needs at a much lower price.[24] The Court finds that due to the special combination of components on the chassis, the chassis are uniquely designed for plaintiffs as mobile carriages and mounts for their equipment and as such, the second part of the test is satisfied.

The Court must decide at what point the chassis is to be examined in order to determine whether it could be utilized as a component of a vehicle designed to perform a function of transporting some load other than specialized or similar equipment without substantial or structural modification. The Court finds that the focus must be on the new chassis immediately prior to the installation of the equipment as it is received from the manufacturer. After all, it is the first sale which triggers the manufacturer's excise tax and it is at this point that the chassis comes equipped with all the specially ordered components. *See* Rev.Rul. 79–423, 1979–2 C.B. 386; Rev.Rul. 80–353, 1980–51 I.R. 13.9. *See also Halliburton v. United States*, 4 Cl.Ct. 150 (1983).

In order to use any of plaintiffs' chassis at that point for any transportation purpose other than the transportation of plaintiffs' equipment or similar equipment, it would be necessary to remove all of the

**23.** Although the chassis manufacturers produce many units as shelf items for stocking by dealers, plaintiffs rarely order a unit "off the rack." Rather, practically all of plaintiffs' units are built to specifications prepared by plaintiffs' engineers.

**24.** At trial, the government was able to show used chassis of plaintiffs being used for other vocations, mostly for hauling material and one for transporting racing cars. Presumably, these units were purchased at private auctions where

plaintiffs have been able to sell some of their used chassis, after the equipment has been removed, for an average price of 5%–10% of their original cost. Plaintiffs' engineers testified that they only remove the equipment and sell their used chassis after, in their opinion, the chassis have surpassed their useful lives and are no longer capable of performing their intended function, and that the typical auction buyer is purchasing a used chassis for its salvage value.

deck mounting members and brackets, including over rail cross-member, and subframe, and add in-frame cross-members where necessary. It would also be necessary to remove from the chassis the other special components ordered by plaintiffs from the manufacturer. This would include removing the split shaft transfer case and adding a new drive line and mountings where necessary. The air and fuel tanks, tool boxes and battery lines in all likelihood would have to be relocated. In addition, the chassis frames would have to be lengthened or shortened, the rear-end ratio changed, and the front or rear axles changed to one with different capacities, all to make the chassis suitable for transportation of another type of load. The wheel bases may also have to be shortened. For plaintiffs' trailers, the main beams would have to be strengthened, and cross-members and side rails would have to be added.

The question then becomes whether these changes are substantial structural modifications. The Court answers this in the affirmative. Substantial means "important" or "essential." Structural means "relating to the structure." The over rail cross-members, deck equipment and mounts add functional strength to the chassis and are integral parts of the unit as a whole. As such, their removal would be the removal of something important or essential to the structure and therefore would constitute a substantial structural modification.[25] The lengthening or shortening of the chassis frame would also be a substantial structural modification. To lengthen or shorten the frame, one would have to remove the bumper, which also serves as a cross-member, the tail lights and any obstruction; either connect the additional frame along with any needed cross-members or cut the frame; and then re-install the bumper and tail lights.[26] Sim-

ilarly, changing the front and rear axles to achieve different loading capacities, and changing the rear-end ratio are substantial structural modifications. To alter the rear-end ratio, one would cut the frame behind the rear spring wheel and add a cross-member where necessary. The frame is the backbone of the chassis, and any cutting of the frame, even at the end, would clearly be something significant that relates to or affects the physical integrity of the chassis.

▆ The government argues that it is irrelevant whether someone would order or buy one of plaintiffs' chassis in determining whether they could be used in another application. Rather, the government would simply ask whether someone would use them in another application. The Court disagrees. The new regulation must be read in realistic and practical terms. A proper inquiry should be whether a chassis could *reasonably* be used as a component of a highway vehicle. Plaintiffs' chassis are not suitable for another application in their present form without major modifications. It is their entire configuration rather than a single or few features that prevents them from being used as component parts of other vehicles without substantial structural modification. By virtue of their special design, their use is greatly limited, in terms of speed, acquisition cost and maintenance cost. Of course, given the necessary time, expertise and money, one of plaintiffs' chassis could be converted to another use. However, no one would reasonably do so when a suitable chassis for another application could be acquired from the manufacturer at considerable cost savings. Therefore, the Court finds that by reason of plaintiffs' special design, their chassis cannot be used as a component of a vehicle designed to perform a function of transporting any load other than that or

---

**25.** However, if a cross-member must be removed because it is over the rail and an in-frame cross-member is installed at the same or nearby point along the frame rails, although two substantial structural modifications have been made, i.e., the removal of one and the addition of another, the net result is that no

substantial structural modification has taken place.

**26.** The IRS has ruled that such a change would significantly alter the transportation function of the chassis. *See* Rev.Rul. 78–217, 1983–1 C.B. 346.

**1130**

similar equipment without substantial structural modification. Thus, the three-part exemption of paragraph d(2)(i) of the 1977 regulation is satisfied and plaintiffs' units are exempt from the tax imposed by Section 4061.

■ Assuming the Acid Trucks are not considered under the three-part test, the Court would nevertheless find these units to be exempt under the off highway transportation exemption. Under this exemption, a unit is not considered a highway vehicle if it: (1) is primarily designed to transport a particular load other than over the public highway; and (2) by reason of such design, its ability to transport such load over the public highways is substantially limited or impaired. 26 C.F.R. § 48.-4061(a)–1(d)(2)(ii). The Acid Trucks clearly satisfy the first requirement. These units are equipped to carry up to 1500 gallons of acid to a jobsite. However, as discussed earlier, these units are substantially impaired by reason of their high operating costs, limited speed and acquisition costs. Thus, the second part is satisfied and the Acid Trucks would be exempt from the tax imposed by Section 4061.

Plaintiffs further claim that because their competitors' units were held to be exempt from the excise tax in private letter rulings, their units should likewise be exempt under the "equality doctrine" enunciated in *International Business Machines Corp. v. United States*, 343 F.2d 914, 170 Ct.Cl. 357 (1965). Otherwise, plaintiffs maintain, their competitors will receive an unfair advantage by being accorded favorable treatment. Because the Court has found plaintiffs' units to be exempt from the tax, there is no need to decide this issue.

In conclusion, the Court holds that all of plaintiffs' units are not subject to the manufacturer's excise tax. Accordingly, Halliburton is entitled to a refund in the amount of $143,261.85 together with accrued interest. Otis is entitled to a refund in the amount of $6,604.00 together with accrued interest. In addition, pursuant to 26 U.S.C. § 7430, plaintiffs are entitled to recover from the government their reasonable litigation costs, including attorney's fees, not to exceed $25,000.00. It is therefore ORDERED that Halliburton and Otis recover from the government $143,261.85 and $6,604.00 respectively plus interest along with their reasonable litigation fees, not to exceed $25,000.00.

A judgment will be entered accordingly.