UTILICORP UNITED, INC.

v.

UNITED STATES.

No. 450–83T.

United States Claims Court.

Sept. 24, 1990.

**454**

Martin M. Loring, Kansas City, Mo., for plaintiff.

Elizabeth D. DePriest, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

YOCK, Judge.

The plaintiff seeks recovery from the Government of highway use taxes, interest, and penalties paid for the taxable years beginning July 1975 through July 1982 that were assessed on 51 digger derrick vehicles owned and operated by the plaintiff utility company. Trial was held on February 13–15, 1990, in Kansas City, Missouri, to determine if these vehicles met the criteria for the mobile machinery exception as stated in the Treasury Regulations, which would exempt plaintiff's vehicles from the highway vehicle use tax.

Oral and documentary evidence were admitted at the trial, and post-trial briefs and findings were filed. Upon full consideration of the entire trial record, this Court concludes that the plaintiff's vehicles fit within the mobile machinery exception and, therefore, are not highway vehicles subject to tax. Accordingly, the plaintiff is entitled to a refund of the tax, interest, and penalties assessed against these 51 vehicles.

### Factual Background

The plaintiff, Utilicorp United, Inc. (Utilicorp), is a public corporation organized and existing under the laws of the State of Delaware and operating in seven states through five divisions. Missouri Public Service Company, sometimes known as "MoPub," is one of these divisions, which provides electric and natural gas utility services in the western part of the State of Missouri, serving rural, semi-rural, and urban areas in and around Kansas City, Missouri. In the course of its business, the plaintiff owned and operated 51 mobile digger derrick vehicles [1] during the taxable periods beginning July 1975 through July 1982.

1. Initially, 73 vehicles were in issue: 58 mobile digger derricks, 10 mobile aerial lifts, and 5 mobile cranes. At the opening of trial, plaintiff abandoned its claim for the 10 aerial lifts and the 5 cranes. Subsequently, during the plaintiff's case-in-chief, Utilicorp dropped its claim for 7 of the 58 digger derricks, leaving only 51 digger derricks in issue. The 7 dropped digger derrick vehicles were those with the digger derrick boom equipment center-mounted on the vehicle. The remaining digger derrick vehicles in issue all have the digger derrick boom equipment mounted on the right rear corner of the vehicle.

MoPub's digger derrick vehicles are self-propelled, two-axle, medium duty trucks with manufacturers' gross vehicle weight ratings in the range of 24,000 to 27,500 pounds. Upon these truck chassis, construction and drilling equipment is permanently mounted for use in plaintiff's business. Although MoPub operated these trucks on the public highways during the relevant years (1975 through 1983), the operation of the construction and drilling equipment is unrelated to transportation on or off the public highways. The digger derricks would, of course, be driven on the public highways in order to get to the jobsite. Once at the jobsite, the vehicles would be positioned off the public highways to perform their construction and drilling functions of removing and installing utility poles.

A digger derrick consists primarily of a hydraulically-powered boom which has several implements attached that assist in the placement and maintenance of the power utility lines and poles. The boom extends out from the truck and is equipped with a large steel auger that is operated by the power from the truck engine via the power takeoff. By utilizing this digger or auger in a vertical fashion, holes are drilled for the power poles. Thereafter, the digger portion is retracted back into a storage position, and the derrick portion, which is similar to a crane, picks up the pole, lifts it into a vertical position, and inserts it into the hole.

Likewise, if the job entails replacing an existing pole, the derrick portion latches onto the old pole and pulls it from the ground. Another feature of the digger derrick vehicle is the insulated aerial lift bucket, in which an employee stands and maneuvers the energized power line out of the way while the operation is being done. Thus, the digger derrick vehicle has the capability to remove poles, install new ones, and transfer the lines between them. All of the digger derrick equipment that is in issue is mounted on the right rear corner of the truck chassis.

Pursuant to 26 U.S.C. § 4481(a) (1982): [2]

A tax is hereby imposed on the use of any highway motor vehicle which * * * has a taxable gross weight of more than 26,000 pounds, at the rate of $3.00 a year for each 1,000 pounds of taxable gross weight or fraction thereof.[3]

The term, "highway motor vehicle" is defined as any motor vehicle that is a highway vehicle. 26 U.S.C. § 4482(a) (1982).

Utilicorp timely filed federal excise tax returns (Form 2290, Federal Use Tax Return on Highway Motor Vehicles) for each of the annual periods in issue beginning July 1975 through July 1982, and paid the tax shown as due. Subsequently, the Internal Revenue Service (IRS) assessed the plaintiff for additional taxes, interest, and penalties, which the plaintiff remitted. Claims for refunds were thereafter filed with the IRS by Utilicorp, alleging that the vehicles were not "highway vehicles" as the vehicles qualified under the mobile machinery exception set forth in the section 4061 regulations. The mobile machinery exception provides that:

A self-propelled vehicle, or trailer or semi-trailer, is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or operation similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment or equipment is unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (C) by reason of such special design,

---

**2.** The Internal Revenue Code of 1954 and the Treasury Regulations of 1977 were stipulated by the parties as the applicable statutes and regulations governing the issues in this case.

**3.** The vehicles at issue are no longer subject to the provisions of this section as the minimum gross weight has since been raised to 55,000 pounds.

such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

Treas.Reg. § 48.4061(a)–1(d)(2)(i) (1977).

All of the plaintiff's claims for refunds were disallowed by the IRS, and the plaintiff then sought relief in this Court by filing its original complaint on July 12, 1983, and its amended complaint on August 8, 1988, adding the annual periods of July 1979 through July 1982 and certain short periods.

It is the plaintiff's contention that the digger derrick vehicles are not highway vehicles, and therefore, are not subject to the Highway Vehicle Use Tax. In support of this contention, plaintiff maintains that these vehicles consist of a chassis that (1) has been permanently mounted with construction or drilling equipment unrelated to transportation on or off the public highways; (2) is specially designed to serve only as a mobile carriage, mount, or power source for the digger derrick equipment; and (3) could not, without substantial structural modification, be used as a component of a vehicle designed to function other than transporting this type of equipment or similar equipment requiring such a specially-designed chassis.

The Government, in this case, has never seriously contested that the plaintiff's digger derrick vehicles met part A of the three part mobile machinery exception. That is, the Government conceded early on that the plaintiff's vehicles consist "of a chassis to which there has been permanently mounted * * * machinery or equipment to perform a construction, * * * drilling, * * * operation * * * [and that] * * * the operation of the machinery or equipment is unrelated to transportation on or off the public highways * * *." Likewise, the Government also agreed that the digger derrick vehicles met the second part, part B, of the mobile machinery exception. At the conclusion of the plaintiff's case-in-chief, the Government

admitted that the chassis of the vehicles in question were specially designed to: "serve only as a mobile carriage and mount (and a power source, where applicable) for the * * * machinery or equipment involved * * *." After hearing the testimony of plaintiff's expert witness, Mr. Bradley D. Wiltse, concerning the five elements of the vehicle chassis, the Government abandoned its challenge that plaintiff failed to meet this second standard. This left the plaintiff to convince the Court only on the remaining third part, part C, of the exception in order to prevail in this action. This part states:

(C) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

Treas.Reg. § 48.4061(a)–1(d)(2)(i)(C).

Utilicorp followed a general procurement pattern in acquiring the vehicles that were subsequently modified to accommodate the digger derrick equipment. A basic truck chassis is ordered from the manufacturer, either General Motors Corporation or Ford Motor Company, and equipped with certain heavy-duty features specified by the plaintiff such as the heavy-duty transmission, heavy-duty reinforced frame, and heavy-duty spring suspension. Once the chassis has been received by the plaintiff, it is then taken to an original equipment manufacturer (OEM) or vendor, who sells and installs the digger derrick equipment, for further structural modifications to the chassis. The modifications made by the OEM/vendor include five modification items.

The five chassis modification items constituting a specially-designed chassis, as agreed by both parties, are as follows:

1. fishplating (or additional reinforcement) on the frame rails;

2. bobtailing (or shortening) the rear of the frame;

3. attaching a winch to the front end of the frame;

4. adding auxiliary leaf springs to the right rear spring stack to support corner mounted digger derrick equipment; and

5. adding a Waterous full-torque power takeoff.

Although the plaintiff orders heavy-duty frames from the manufacturer, which typically include frame rail reinforcement in the shape of an "L" installed along the side of the longitudinal frame rails from the rear of the front spring hanger to the front of the rear spring hanger, this reinforced heavy-duty frame by itself is insufficient because of the torsion and twisting load that the corner-mounted digger derrick imposes on the frame. Therefore, the OEM/vendor adds additional reinforcement or fishplating by welding or bolting steel plating along the frame rail from the front of the rear spring hanger to the rear of the truck frame. Specifically, four horizontal strips of steel, weighing approximately 20–30 pounds each, are welded or bolted to the inside of the longitudinal frame rails, two on the upper flanges and two on the lower flanges. Likewise, additional fishplating is sometimes added on the vertical web of the frame rail channel member between the front and rear springs.

The second modification made by the OEM/vendor is to shorten or "bobtail" the rear end of the frame. Removing a portion of the rear longitudinal frame rail allows the digger derrick equipment to be mounted closer to the rear axle to avoid sustaining structural damage to the chassis and overloading the rear axle because of the torsioning and twisting imposed by the digger derrick's movements.

In addition to the fishplating and bobtailing, on all but three of the plaintiff's 51 vehicles in issue, a front-end winch is either bolted to or welded onto a channel iron extension to the front end of the frame in order to permit the vehicles to "winch" into and out of a jobsite where necessary. For instance, the cable from the winch may be wrapped around a tree or some other stationary object to maneuver the truck into the designated rough terrain area, which the truck cannot be driven into because of the severe off-road conditions.

The fourth modification involves the addition of up to six heavy-duty spring leaves to be added to the heavy-duty springs on the right rear corner of the digger derrick vehicle. Since the weight of the digger derrick equipment is concentrated on the right rear corner of the vehicle, the right rear spring assembly must be strengthened to compensate for the additional weight. The average digger derrick boom equipment weighs between 8,000 and 10,000 pounds, which is a dense weight located in a very small area. Despite the heavy-duty rear springs ordered from the manufacturer, the OEM/vendor must remove the right rear spring stack and insert additional leaves, usually four to six heavy-duty leaves, to support this concentrated weight.

The fifth and last modification made is the installation of a specially-designed power takeoff. On 34 of the 51 vehicles, a Waterous [4] full torque power takeoff has been mounted, which converts and transfers 100 percent of the engine power to the digger derrick. Full torque or 100 percent of the engine capacity is required to adapt to the various jobsites encountered. When heavy rock or solid rock must be drilled, a regular power takeoff operated off the side of the transmission would not have the capability to dig through this type of material, and if such a feat were even attempted, the truck itself would likely be severely damaged. Thus, the full torque is mandatory to accomplish that type of drilling work. Those 17 vehicles that are not equipped with the Waterous full power takeoff, are equipped with a regular power takeoff either installed by the chassis manufacturer or the OEM/vendor.

To complete the installation of the Waterous, which is mounted in the center of the drive line, as compared to a regular power takeoff which is typically bolted to the side of the transmission, the entire drive line and hanger bearing must be removed. The particular digger derrick ve-

---

4. Waterous is the name of the company that manufactures this piece of equipment.

hicles in issue have a long cap axle, exceeding the requirements of a single drive line, so that they have a two-piece drive line supported mid-frame by a hanger bearing. Once the drive lines have been removed, the OEM/vendor fabricates a channel member that will fit between the frame rails, mounts the Waterous power takeoff to it, and then bolts or welds the new channel member to the side frame rails. With the Waterous power takeoff now installed, the original drive lines must be modified to accommodate the space now occupied by the Waterous. Therefore, the drive lines are shortened to meet the measurements from the rear of the transmission center line yoke to the front of the Waterous center line yoke and from the rear of the Waterous yoke to the rear axle center line yoke.

One unique feature of the Waterous full torque power takeoff is that when the takeoff is engaged, all the engine power goes to the Waterous through the front drive line and no power is delivered to the rear axle through the drive line behind the Waterous. Consequently, a vehicle equipped with a Waterous can either utilize the equipment being driven by the power takeoff or use the engine power to turn the rear axle in order to drive the truck, but not both at the same time. Thus, the potential to convert a Waterous equipped digger derrick vehicle to other highway applications that might use a power takeoff but would require the vehicle to be proceeding at the same time is extremely limited unless, of course, the Waterous were to be removed. A new Waterous power takeoff for use in digger derricks would currently cost around $4,500.

These five modifications made by the OEM/vendor to the truck chassis qualified plaintiff's 51 digger derrick vehicles as specially-designed chassis to serve only as a mobile carriage, mount, and power source for the digger derrick equipment—the second requirement (part B) of the mobile machinery exception. As already indicated, the Government conceded this portion of the regulation at the conclusion of the plaintiff's case-in-chief. Therefore, the only issue remaining before the Court is whether the plaintiff's digger derrick vehicles meet the third requirement (part C) of the mobile machinery exception. That is, whether the chassis of the plaintiff's vehicles, by reason of the special design (as agreed to by both parties), could not, without substantial structural modification, be used as a component of a vehicle designed to transport a load other than the digger derrick equipment. Consequently, the Government's case focused on the meaning of the phrase "substantial structural modification," and the alternative uses for the plaintiff's specifically modified digger derrick vehicle chassis as highway vehicles without making any further substantial modifications.

Both of the Government's expert witnesses, Mr. Russell R. Noble and Mr. Claude Travis, testified as to what components of the chassis they considered to be structural, as well as what structural modifications would be considered substantial, in terms of time to change, cost to change, the nature of the modifications, and the result of the modifications. During the plaintiff's presentation, Mr. Wiltse addressed each of the five modifications, which subsequently qualified the chassis as being specially designed, as to the necessity of removing the modifications made by the OEM/vendor in order to convert these chassis to other uses suitable for hauling loads over the highway and why these were or were not substantial structural modifications.

The plaintiff was willing to concede that had the vehicle chassis only been modified to include the fishplating, the bobtailed rear end, and the front-end winch, then those three features combined would not make it physically impossible or economically unrealistic to use the vehicle in some other over-the-road hauling capacity. It was the plaintiff's argument, however, that when these three modifications are taken in conjunction with the asymmetrically built up right rear springs, and certainly with the Waterous full torque power takeoff, the standards of the mobile machinery exception are met. In this connection, the plaintiff urges that the springs and the

Waterous separately and independently fulfill the substantial structural modification requirement. In short, it is the plaintiff's position that once all the modifications necessary to perform the digger derrick function have been made, it would require substantial structural modification to convert these vehicles back into normal highway use (hauling type) vehicles.

All of the expert witnesses were questioned extensively as to their definition of the *structure* of the chassis, and each one held a different opinion. All of the experts did agree, however, that the chassis of a truck is comprised of four major components: (1) the cab, (2) the frame, (3) the suspension system (springs, shock absorbers, wheels, tires, axles), and (4) the drive train (engine, transmission, drive line, differential). Similarly, the three experts concurred that the frame is the "backbone" of the chassis, consisting of the two longitudinal rails connected by cross-members at given intervals, and serving as a platform to which all other components are attached or mounted.

The other point of agreement among the experts was that it would be necessary to remove the additional leaf springs that were initially inserted to support the digger derrick equipment before the chassis could be converted to any other use. Once the digger derrick equipment was taken off the chassis, the added springs would result in the rear of the vehicle being skewed or tilted, causing the vehicle to pull severely to the left when driven, thus posing a threat to highway safety. The disagreement arose, however, as to whether the removal of these springs qualified as a *substantial structural* modification. The two Government experts believed that the removal of the additional heavy-duty spring leaves was neither a *substantial* nor a *structural* modification. The plaintiff's expert, however, believed that the spring removal modification was both a *substantial* and a *structural* modification.

As to the plaintiff's definition of the structure of the chassis, Mr. Wiltse, the plaintiff's expert, testified that the chassis structure is composed of all the chassis components connected to the frame (the longitudinal frame rails and cross-members) and that the terms "structure of the chassis" and "chassis" were synonymous. Mr. Wiltse's expert opinion was based on his truck industry experience working both at an OEM dealership, which installed some of the digger derricks in issue, for approximately nine years, and his subsequent experience at MoPub over the last eight years. At both of these companies, Mr. Wiltse started as a mechanic and was promoted to such positions as shop foreman, service manager, plant supervisor, and finally to fleet supervisor. Each of these positions required hands-on experience with such vehicles as dump trucks, tank trucks, flatbeds, digger derricks, boom trucks, crane trucks, and Hotstik trucks. Mr. Wiltse was accepted by the Court as an expert witness on the design and operation of the digger derricks in issue; the standard customs and practices in the operation of a trucking fleet; and the design, operation, and function of chassis cab configurations within the trucking industry.

In Mr. Wiltse's opinion, there is no distinction between structure and chassis, and thus, the components that make up the chassis also constitute the structure of the chassis. Furthermore, since two of the major components of the chassis are the suspension system and the drive line, Mr. Wiltse testified that the removal and restacking of the spring system and the removal of the Waterous full torque power takeoff would be substantial structural modifications to the chassis by themselves.

Mr. Wiltse outlined the procedure that would be required to remove the additional leaves originally inserted as follows:

A One would have to take a lift and actually jack the weight of the truck frame up off of the springs to get them to their normal state, which would be what we would call an unloaded condition.

Tr. 143.

A To correct that condition [so that the truck would be driveable], one would be required to remove the right rear spring stack, from the truck frame and rear

axle, disassemble, remove the additional springs that had been inserted in it, replace it, restack it, and then insert a new stack indexing pin because of [sic] the old stack indexing pin is going to be too long.

Then you would also be required to replace the U-bolts that held it to the axle, because now they are going to be too long because you have shortened the stack.

Tr. 142–43.

Mr. Wiltse estimated that it would take one competent mechanic between three and five hours to complete this operation, and upon consideration of labor, time, and the eventual result, concluded that this operation would be a substantial structural modification to the chassis. In short, it was Mr. Wiltse's opinion that since the springs or suspension system are an essential and substantial portion of the chassis, there is no more substantial job involving the springs "than having to remove them all, withdraw some from the stack and then put them all back together." Tr. 146. Mr. Wiltse stated that he was unaware of any other purpose for which these vehicles could be used other than carrying a digger derrick or equipment very similar to it, *i.e.*, a dense weight localized on the right rear corner, if the additional springs were not removed. Consequently, especially in terms of the result, removing the asymmetrical springs was a substantial structural modification to the chassis of the vehicle.

As to the removal of the Waterous power takeoff, Mr. Wiltse contacted the Waterous Company in Minnesota, as well as three national vendors that the Waterous sales manager indicated were extensive users of the equipment, to inquire whether the Waterous TML model [5] is necessary equipment for any truck usage other than for digger derricks or similar equipment. Based on the information he received, Mr. Wiltse concluded that there is no use for that particular model other than for digger derricks or like equipment.

The alternative uses for the plaintiff's vehicles, which could possibly utilize the features of fishplating, bobtailing, and the front-end winch, although such features may be less useful than for the digger derrick application, would only require a conventional transmission-mounted power takeoff. Such options include a garbage truck, dump truck, or a cement mixer; yet Mr. Wiltse testified that throughout his 16 years of experience in the trucking industry, he had never seen a garbage truck, dump truck, or cement truck equipped with a Waterous or similar full torque power takeoff.

In explanation, he gave two reasons for this absence of a full torque power takeoff. The first reason was based strictly on cost. A new Waterous TML would cost approximately $4,500 today, not including labor charges, and in 1976, Mr. Wiltse estimated that the purchase price would have probably been between $2,000 and $2,500. The aforementioned possible alternative uses for these vehicles only require a conventional power takeoff costing between $200 and $300. Therefore, Mr. Wiltse was of the opinion that it would not be economically feasible to sell a chassis with a mounted Waterous to an operator who wanted to use it as a dump truck or garbage truck, since no one would be willing to spend an extra $4,500 for a chassis to get the full torque power takeoff when it was not required. Furthermore, Mr. Wiltse speculated that if, for some reason, an operator came into possession of one of these chassis equipped with a Waterous, he would likely remove it and replace it with a conventional $300 power takeoff and then sell the Waterous for a profit.

The second reason was based on limitations on use. Mr. Wiltse explained that although it would be physically possible to use the chassis with the Waterous intact for one of these alternative purposes, it would not be possible for the truck to move forward once the power takeoff is engaged. This prohibition would be disad-

---

**5.** This particular model is the only Waterous model used in digger derricks and particularly the digger derricks in issue.

vantageous to the dump truck operator since it is frequently necessary to lift the dump bed while the truck is moving forward, such as when spreading salt, asphalt, gravel, or sand on the highway. To accomplish this type of task, the bed would need to be slowly elevated as the truck moves, and with the Waterous in the drive line, either the bed could be elevated or the truck could move forward, but not both at the same time.

Similarly, this simultaneous dual-action prohibition would limit the capability of a garbage truck. On these types of vehicles, Mr. Wiltse pointed out that the power takeoff operates the trash compactor, and it is desirable to compact the trash while moving from stop to stop so as to increase productivity, but that this would be impossible with the Waterous in place. The final example discussed by Mr. Wiltse was a cement mixer. Again, the same restriction would apply. As the truck is driving down the road, the mixer, operated by the power takeoff, would be motionless, and the cement would then harden inside the drum.

Because of the cost of the Waterous, the resale value, and the restrictions it imposes on the operations of the vehicle, Mr. Wiltse felt that a normal reasonable operator would remove it, replace it with a $300 power takeoff, and then sell the Waterous. The removal process would be basically the reverse of the installation process, and Mr. Wiltse described it as follows:

A The first thing you would do would be to remove the drive lines, remove—

Q What next?

A Remove the [W]aterous and crossmember [sic].

Q The crossmember that was installed between the frame rails to hold the [W]aterous?

A That's correct.

Q Why would you have to remove that? Why could you not leave it there?

A It is very likely that it may obstruct the installation of the new drive line and carrier bearing.

\* \* \* \* \* \*

Q The two pieces of the drive line which were connected to the [W]aterous front

and rear, would you be able to reuse those in your new, rebuilt drive line?

A No, you would not.

Q Why not?

A Because of the arear [sic] that the [W]aterous takes up, the original drive lines had to be shortened; therefore, once removing that [W]aterous, they would then be too short to reuse, they would also have the wrong end yokes on them, so you would have to basically purchase new drive lines and hanger bearing to go back in.

Q What is the end yoke?

A The end yoke is basically what is commonly referred to as a universal yoke. This is the portion that is actually the working end of a drive line that allows it to rotate on its axis, even at an angle and still function. They are also part of what they call the coupling sequence of a drive line.

Tr. 158–60.

It was Mr. Wiltse's opinion that it would take a competent mechanic between five and seven hours to remove the Waterous and replace it with a new rebuilt drive line. He further testified that since MoPub is a regulated public utility company, it would be required to account for the cost of the Waterous, either as being recouped in the selling price of the vehicle or as a write-off for the loss if the vehicle were sold with the Waterous still mounted. As with the removal of the right rear springs, it was Mr. Wiltse's opinion that removing the Waterous power takeoff and the attendant components and thereafter rebuilding the drive line would constitute a substantial structural modification. In fact, he stated that there was nothing more substantial that could be done to a drive line than to remove it and replace it, which is precisely the procedure required to remove the Waterous.

In summary, it was Mr. Wiltse's expert opinion that it was economically infeasible to convert these digger derricks as modified back to another highway use without substantial structural modification. In his years with MoPub, he had never seen nor

heard of a digger derrick being so converted. In fact, the only thing that had ever been done with retired digger derrick vehicles was to sell them for salvage or scrap. Mr. Wiltse made a very effective and competent witness for the plaintiff's position.

The Government's case was presented by two expert witnesses, both independent consultants. Mr. Russell R. Noble was qualified as an expert witness in the field of truck design, engineering, and usage after demonstrating his experience in these areas. He has been in truck engineering for 40 years, working at Chrysler Corporation for approximately 32 years in various capacities. From his initial position as a student engineer, he advanced through several positions: Chief Engineer of Truck Design and Development; Chief Engineer for Truck Safety Reliability and Advance Engineering; Chief Program Engineer, all of which focused on truck products. At the present time, Mr. Noble has his own automotive consulting firm and has been in business since 1982. Additionally, Mr. Noble holds a bachelor of science degree in electrical engineering and a master's degree in automotive engineering.

Prior to the trial, Mr. Noble had conducted his own inspection of two of the vehicles in issue, during which he made notes and took photographs. He also took several photographs of sales brochures that illustrated alternative applications for the plaintiff's chassis.

In selecting the applications he felt would be possible, Mr. Noble focused on the gross vehicle weight rating, the cab to axle dimension, the cab to end-of-frame dimension, and the wheel base. Primarily, he sought applications that would require similar dimensions to the plaintiff's chassis and that could utilize the shortened rear frame and hydraulic hoist. The photographs illustrated such examples as a tilting platform for transporting motor vehicles; a dump platform used to carry building materials, lumber, plywood, etc.; a dump truck used in parks to collect brush and shrubbery; a wrecker vehicle; and a grain-hauling body.

It was Mr. Noble's opinion that plaintiff's chassis could be converted into some or all of these applications without having to remove the additional fishplating and the front-end winch. As for an alternative use that could utilize the bobtailed rear end as it currently exists, Mr. Noble clarified that none of the possible alternatives he presented required the rear frame rail to be extended, but he could not suggest an alternative that could use the chassis "as is" without any further shortening of the frame rails. In short, further bobtailing was a distinct possibility.

As for the built-up right rear springs, Mr. Noble testified that there was "no alternative application that has the non-concentric loading that's produced by a digger derrick and therefore any of the applications that I've identified would require equal capacity front and rear springs." Tr. 292. Despite the necessity of having to remove the springs, Mr. Noble did not believe the removal and restacking of the springs involved a substantial or a structural modification.

For all of these alternative applications, Mr. Noble stated it would be unnecessary to remove the Waterous to convert plaintiff's chassis to one of these uses, but there would just be more torque available than would be required. He did qualify his opinion by stating:

If you were starting with a brand new vehicle you wouldn't put a [W]aterous in any of the vehicles that I've identified.

Tr. 264. Furthermore, in discussing the possibility of these particular alternatives having a Waterous, Mr. Noble stated:

Q Do any of the trucks depicted in any of these photos that you brought the Court have [W]aterous full torque power take-offs inserted in the drive line?

A I can't tell you with certainty. It would be my expectation that none of them have.

Q And the reason that would be your expectation is that those kinds of trucks don't generally have [W]aterous full torque power take-offs do they?

A   That's correct.

Tr. 299.

Mr. Noble's definition of the structure of a chassis, as that term is used in the regulation, is that portion of the longitudinal rails (frame) that extends from the front spring front hanger to the end of the frame sufficiently to support the load being carried, *i.e.*, the frame side rails and the appropriate cross-members. According to Mr. Noble, the structure is only a limited part of the chassis, and does not include the springs, the transmission, or the drive line. More specifically, Mr. Noble views structure as being synonymous with the frame of the chassis, but only to the extent that the frame assembly is needed to support the load. Thus, if the frame rails as built by the manufacturer are longer than needed to support the body or equipment to be mounted, then that portion not required for support is not a part of the structure.

An example of what Mr. Noble considered to be a substantial structural modification was converting a beverage truck to another use after the frame had been cut behind the cab and in front of the rear spring front hanger and dropped to accommodate the loading of cases. Another, but less extreme, example was shortening and lengthening of the frame rails between the front and rear axles, which would result in changing the wheel base and the cab-to-axle dimension. A "lesser" substantial structural modification would be the addition of a cross-member, according to Mr. Noble; however, placing a cross-member back into an area where one previously existed but was removed for the installation of some type of special equipment, would not be a substantial structural modification, but only a minor structural modification.

When asked to apply his opinion as to the definition of structure and what constitutes a substantial structural modification to the five specific elements on plaintiff's vehicles, Mr. Noble agreed that the fishplating was a structural component of the chassis, yet it would not be a substantial modification since he felt having the additional reinforcement would be advantageous for many alternative applications and thus should be left untouched. The implication of Mr. Noble's testimony appeared to be, however, that if the fishplating had to be removed, such removal would constitute a substantial structural modification.

Concerning the bobtailed rear end, as stated above, it was Mr. Noble's opinion that shortening the frame would be a structural modification only if the frame rail was needed to support the body or equipment to be mounted. If, on the other hand, that portion is superfluous to the support needed, then Mr. Noble did not view' it as structural. Furthermore, Mr. Noble did not have an informed opinion as to whether there were any other applications that could use the plaintiff's chassis *as is* without having to lengthen or shorten the rear end.

As for the front-end winch, it was Mr. Noble's opinion that it was neither a structural component of the chassis nor would it constitute a substantial modification to convert the chassis to another application. Like the fishplating, Mr. Noble believed it would be desirable to another operator to have the winch available.

Even though Mr. Noble concurred that the built-up rear springs would have to be removed before plaintiff's chassis could be used for any alternative application, he did not view this procedure as either structural or substantial because it would not change the structure (*i.e.*, the frame) and the process of removal was not substantial. He did believe, however, that the springs were an essential and significant part of the chassis.

Likewise, Mr. Noble believed that the Waterous power takeoff was not a part of the structure of the chassis and its removal would not be a substantial structural modification. Mr. Noble testified that the cross-member installed by the OEM/vendor, upon which the Waterous had been mounted, would not need to be removed; only the Waterous housing itself needed to be removed. Once the Waterous is removed, Mr. Noble stated that a hanger bearing could then be mounted on that cross-mem-

ber to support the drive line. He did, however, agree that new drive shafts would be necessary after removing the Waterous.

Although Mr. Noble was clearly an acknowledged expert in the field of truck engineering and design, his views on what the terms used in the Treasury Regulations meant were, in this Court's view, far too restrictive. Nevertheless, Mr. Noble's testimony was helpful to the Court in arriving at its decision in this case, and he was an effective and competent witness for the Government's position.

The Government's other expert witness, Mr. Claude Travis, held the same opinion as Mr. Noble with respect to the five elements of plaintiff's vehicles; however, Mr. Travis expressed a different opinion as to the meaning of the structure of the chassis.

Mr. Travis is currently a fleet consultant and part owner of a heavy-duty truck repair shop and performs such responsibilities as identifying repair work that should or should not be done based on profitability. Additionally, Mr. Travis sets the labor rate and the prices charged for parts. Prior to this business, Mr. Travis had been a staff engineer at the Interstate Commerce Commission for the Director of Locomotive Inspection, the area maintenance manager at Consolidated Freightways (a common carrier), the Director of Engineering at Interstate Motors Systems, and the Vice President of Transportation and Equipment at Trans American Freight Lines. He has been in the business of truck operation, maintenance, and repair for 31 years and has an engineering degree from the United States Merchant Marine Academy. Mr. Travis was offered and accepted as an expert witness in truck assembly specifications, chassis modifications, and cost and time of truck repairs.

In Mr. Travis' opinion, the structure of the chassis includes the two frame rails, the cross-members that compose the frame, and anything else that is load bearing and sprung weight. He elaborated to explain that the springs are not included in this definition of structure because the springs are included in the suspension, and therefore, are not sprung weight. Pared down,

Mr. Travis testified that he considered the structure to be the frame of the truck, including the spring hangers. This position differed somewhat from the position of Mr. Noble, the Government's other expert witness, in that Mr. Noble would find a "structural" modification only if the modification altered the frame—and then only that part of the frame that was load bearing. Mr. Travis would find the entire frame plus the spring hangers to be the "structural" part of the "chassis" as those terms are used in part C of the mobile machinery exception.

Examples of what Mr. Travis considered to be substantial structural modifications to trucks included increasing or decreasing the wheel base, widening the distance between the frame rails, and making an asymmetrical frame structure.

Concerning the five specific elements of plaintiff's chassis, Mr. Travis believed the fishplating was a structural component of the chassis; however, he also believed it would be a desirable factor for other possible uses, such as for a dump truck or a wrecker. Therefore, no modification would be recommended. Likewise, Mr. Travis felt the bobtailed rear end was a part of the structure, but again, he felt the shortened frame rails could be utilized in some other application and stated, "[y]ou may find one body configuration [of a dump truck] that would require it [at the present length]." Tr. 354.

Mr. Travis described the front-end winch as an applied tool to the structure, rather than as a structural part of the chassis, and believed the winch would be desirable for such other applications as wreckers, logging vehicles, and construction trucks. Therefore, no modification would be required to convert the plaintiff's chassis to another use.

As both Mr. Wiltse and Mr. Noble concluded, Mr. Travis also agreed that it would be necessary to remove the extra leaf springs on the right rear corner in order to make the suspension symmetrical before these chassis could be used for any other purpose. He did not, however, view the removal of the springs as a substantial structural modification to the chassis even

though he agreed that the right rear springs are both a substantial and an essential part of the chassis.

In removing the additional springs, Mr. Travis stated that approximately $65 of new parts would be needed to complete the removal and re-installation: new U-bolts, spring clips, and center bolts. Labor charges in the Kansas City area for truck repairs average between $30 and $37.50 an hour, according to Mr. Travis, and the operation of removing the springs would take about an hour if the chassis did not have the body on it and about two hours for a digger derrick vehicle with a body on it.

Mr. Travis stated that the drive line, upon which the Waterous power takeoff is mounted, is not a part of the structure; however, he did feel the drive line was a substantial and essential part of the chassis. It was Mr. Travis' opinion that there are other applications for the plaintiff's chassis with the Waterous intact, such as a wrecker or a truck mounted with a generator, a welding machine, or a large air compressor—as long as the truck was stationary. If, on the other hand, the Waterous was not going to be utilized, Mr. Travis felt it would not be necessary to remove it in order to convert the plaintiff's chassis to another use; thus, there would be no substantial structural modification to the chassis.

Even if the Waterous were removed, Mr. Travis did not view this operation as a substantial structural modification. On three of the vehicles in issue that Mr. Travis examined personally or by photographs, he noted that each had a different Waterous installation configuration. Therefore, each would entail a different removal process. For each configuration, either part of the drive shaft or the entire drive shaft must be removed, the Waterous taken out, and new drive shafts made and installed using a center carrier bearing if one exists or installing a new one. Time estimates to complete the removal of these three configurations were between three and four hours.

In addition to removing the Waterous, other parts of the vehicle are affected and need to be modified. Specifically, Mr. Travis addressed the plumbing related to the pumping of the hydraulic fluid. These controls would need to be removed or tied back, which would take an additional two hours. Further, a parking brake would have to be installed on the transmission before the truck could be driven on the highway, and this procedure would take approximately two and one-half hours.

After describing the labor, time, and parts necessary to ready the vehicle for another use, Mr. Travis reiterated his opinion that it would not be a substantial structural modification to remove the Waterous power takeoff.

Mr. Travis made an effective witness for the Government's positions, and his testimony was very helpful to this Court, particularly in regard to his testimony about truck repairs (modifications), and the cost and time involved in modifications.

All three of the expert witnesses appeared knowledgeable and credible and were effective in presenting their respective positions. In attempting to assess the relative strength of each party's expert testimony, however, this Court found the Government's position much too rigid and hypertechnical, while the plaintiff's presentation appeared much more logical and made common sense. The plaintiff's position also appeared to be more in line with the economic reality of the real world, and, more importantly, the regulations at issue.

*Discussion*

The sole remaining issue in this action is whether the plaintiff's vehicles meet the final part (part C) of the mobile machinery exception—that is, would these chassis, as initially designed and modified, require substantial structural modifications in order to be converted to another application that would be considered a highway vehicle. It is the plaintiff's contention, of course, that the digger derrick vehicles are not highway vehicles and, therefore, are not subject to the Highway Vehicle Use Tax. In support of this contention, plaintiff maintains that these vehicles consist of a chassis that (1) has been permanently mounted with con-

struction or drilling equipment unrelated to transportation on or off the public highways; (2) is specially designed to serve only as a mobile carriage, mount, or power source for the digger derrick equipment; and (3) could not, without substantial structural modification, be used as a component of a vehicle designed to function other than transporting this type of equipment or similar equipment requiring such a specially-designed chassis. As earlier indicated, the Government has conceded the first two parts (parts A and B) of the three-part exception.

■ Prior to resolving this issue, this Court must decide when the chassis is to be tested to determine whether it could be utilized as a vehicle to transport some other load besides the digger derrick equipment without substantial structural modification. Although it appeared at the beginning of the trial that both parties agreed that the appropriate time period for analysis is that moment when the five chassis modifications are complete and immediately before the body has been installed; subsequently, the Government urged that the more appropriate time period would be at some point during the use of the chassis by the plaintiff. It is clearly to the Government's advantage to argue this time frame in view of the cost of a used Waterous power takeoff as compared to the cost of a new one.

In discussing this same issue, *i.e.*, when to test the chassis for the third part of the mobile machinery exception, the District Court for the Northern District of Texas found that the focus must be on the chassis immediately prior to the installation of the equipment. *Halliburton Co. v. United States*, 611 F.Supp. 1118, 1128 (N.D.Tex. 1985). This conclusion was also reached by the District Court for the Eastern District of Texas in *Custom Bodies Inc. v. United States*, 85–2 USTC ¶ 16,435 (E.D.Tex.1985) (focus of three-part test is character of vehicle chassis, not the body). Likewise, this was the applicable time period concern-

ing highway use taxes as stated in Rev. Rul. 79–423, 1979–2 C.B. 386 (focus of three-part test of regulation is character of vehicle chassis and not limited to original chassis as manufactured, but applies to chassis as modified).

In view of the precedent and the good logic exhibited in those cases and prior ruling, this Court will adopt that same point on which to focus its analysis. Therefore, the point at which the plaintiff's chassis are to be analyzed for compliance with Treas.Reg. § 48.4061(a)–1(d)(2)(i)(C) is when the five modifications constituting the specially-designed chassis have been completed by the OEM/vendor and prior to the digger derrick equipment being mounted.[6]

■ In deciding whether or not the plaintiff's chassis would require a substantial structural modification before they could be utilized for other applications, it is most apparent that the Government would like this Court to adopt a very narrow view of what amounts to a "substantial structural modification." In view of the testimony of its own experts, it appears that the Government would like the Court to distinguish between the meaning of essential, significant, and substantial. Mr. Noble, for instance, classified the necessary right rear springs modification as "significant" and "essential" but not a "substantial" modification. Also, Mr. Travis referred to the drive line (Waterous power takeoff) modification as a "substantial and essential" part of the chassis, yet refused to classify the removal of the drive line as a "substantial" modification.

As Mr. Noble agreed, substantial is a subjective term, which implies different interpretations, or as Mr. Noble stated, "[o]ne persons [sic] view of substantial might be different from another, they might both be right." Tr. 308. Asking this Court to draw a bright line between substantial and significant or between substantial and essential is an unrealistic and illogical request. If the regulations had

---

**6.** Even if the Court were to depart from this analysis and look to a more "used" state of the equipment and chassis, the result in this case would still be the same, since the Court looks to more than mere time and cost to determine the issue of "substantiality" in the regulation.

been intended to be interpreted as narrowly and restrictively as suggested by the Government's experts, then it seems a definition of the word "substantial" would have also been provided—just as the terms "transport" and "public highway" were defined for purposes of the regulation. *See* Treas.Reg. § 48.4061(a)–1(d)(1).

Although it would always be advantageous to one party to lift a particular word from the applicable statute or regulation and focus only on the meaning of that word, that would distort the meaning of the sentence or the entire paragraph. Here, the entire mobile machinery exception is all one sentence, and each lettered requirement relates to the prior one. The Government's attempt to single out the term "substantial" and fashion a tidy definition of what does and does not fit within its parameters is contrary to rational reasoning and common sense. Therefore, this Court will not engage in writing definitions for synonyms here. As the district court recognized in *Halliburton*, 611 F.Supp. at 1129, "[s]ubstantial means 'important' or 'essential'." No further distinction needs to be made.

■ The Government next endeavored to formulate a precise definition of the "structure" of the chassis; however, this endeavor was hindered by the Government's own experts. There were three expert witnesses at trial and three opinions as to what the "structure" included. In fact, a fourth opinion was read into evidence by the plaintiff from the *SAE Handbook*, a publication of the Society of Automotive Engineers, which sets forth standards, defines terms, and contains technical articles.[7] According to the *SAE Handbook*, the definition of a motor vehicle chassis of a truck is:

> the basic operating motor vehicle including engine, frame, and other essential structural and mechanical parts, but exclusive of body * * *.

II *SAE Handbook* 37.01 (1982).

Undoubtedly, each expert's opinion is founded on his own experience, and, as to the *SAE Handbook*, the collective experiences of the members. All these differing opinions, however, clearly show that there is no widely accepted definition of "structural." While Mr. Wiltse's opinion as to the definition of "structure" may have represented the expansive end of the spectrum, Mr. Noble's was the extreme restrictive end. Furthermore, if Mr. Noble's definition were accepted, it would always be changing. Only those portions of the frame rails that are needed to support the equipment or body are, according to Mr. Noble, a part of the structure. Therefore, the entire frame rail from front to rear may be the structure of one vehicle, but only three-fourths of that same frame rail may be the structure of another vehicle, even though both chassis are identical before the equipment is mounted. Adopting such an interpretation as this would only result in a continual battle of the experts to determine how much of the frame rail is needed to support the equipment.

Conversely, all the experts agreed that the chassis is comprised of four components: the cab, the frame, the suspension system, and the drive train. No one listed the four components as the cab, the "structure," the suspension system, and the drive train. Nor did anyone say that the structure is the backbone, but rather all said the frame is the backbone of the chassis. Despite Mr. Noble's testimony that when he talks to his engineers about structure, they know he means the frame, this Court is not convinced that when the Treasury Regulations at issue refer to structure they are referring only to substantial modifications to the frame. The regulations are not written only for engineers to understand. It is this Court's view that the word structure, in the Treasury Regulations at issue here, refers to more than merely the frame. The regulations refer to essential structures that compose the chassis. Nowhere in part C of the regulations is the word "frame" ever used. This Court, in short, is not convinced that a structural modification has to be limited to the longitudinal frame rails and the cross-members. Just as the *SAE Handbook* describes, the chassis in-

**7.** Mr. Travis is a contributing author to the *SAE Handbook*.

cludes the engine, the frame, *and* other structural parts and other mechanical parts. Therefore, there are other structural parts in addition to the frame and other Courts have so found. *See Custom Bodies, Inc. v. United States,* 85–2 USTC at 90,523, and *Halliburton Co. v. United States,* 611 F.Supp. at 1128. Thus, it appears to this Court that the phrase "substantial structural modification," as used in the regulations at issue, does encompass any substantial modification to the very essential suspension (springs) structure and the drive train (Waterous power take-off) structure or system of the chassis.

■ In this case, we are looking at five modifications to a generic heavy-duty medium to heavy/medium chassis. The OEM/vendor modified the chassis in five ways. First, they added fishplating or frame rail reinforcement. This fishplating is welded, or sometimes bolted, to the frame rails from the rear spring hanger to the rear end of the frame. All of the additional fishplating adds considerable weight to the chassis and keeps the frame from twisting when the digger derrick equipment is being used. Although all the experts agreed that this fishplating would not preclude the use of the vehicle for other over-the-road applications, it is clear that extra weight applied to a truck body does tend to limit the alternate uses for which the vehicle may be used. Furthermore, if one were to remove the welded fishplating, it would be a substantial and structural modification—certainly this would be true if one were looking at this modification in conjunction with the other three or four modifications that might be deemed necessary for the use of the chassis as a highway vehicle.

The second modification by the OEM/vendor was the bobtailing or shortening of the rear end, by removing one to two feet of the longitudinal frame rails, and adding heavy-duty cross-members between the frame rails at the rear of the vehicle. Under any definition, this was clearly a "structural" modification. This modification was necessary in order to locate the great weight of the digger derrick equipment as close as possible to the rear axle in order to promote the vehicle's stability. Although all of the experts agreed that bobtailing the digger derricks would not preclude the use of the vehicle for some other highway applications, it is clear that any structural shortening of the frame reduces the number of available uses. For instance, Mr. Noble testified that there were some five applications that would require some bobtailing in order to function appropriately. He was not able to state, however, whether any one of these five applications he envisioned would require further bobtailing or additions to the frame in order to function appropriately for the intended use. Clearly, if further structural modifications to the frame were needed before the vehicle could be used as intended, this would again reduce substantially the likelihood the vehicle would be used for alternative applications. Thus, any further bobtailing, especially in conjunction with the other modifications that would be needed to convert the digger derrick chassis to another highway use, would amount to a substantial structural modification.

The third modification by the OEM/vendor was the welding or bolting of a heavy-duty channel iron extension to the front end of the frame and mounting a winch on that extension. The purpose, of course, of the front-end winch is to permit the digger derrick vehicle to operate effectively in difficult, off-road terrain. All three experts agreed that other highway vehicles might be able to occasionally use a winch in their operations, or at least it would not hinder their highway use. However, this Court finds that highway use vehicles, in the main, would have no use for a structural modification to a chassis that was designed primarily for off-road use. Accordingly, this clearly was a structural modification to the chassis, designed for an off-road use. Thus, the very expensive winch equipment would again be a limiting economic factor that would reduce the likelihood of the chassis being converted to a highway use. If one were to remove the winch and the channel iron extension to reduce the weight of the vehicle, it would be a structural modification to the chassis,

and, in conjunction with the other modifications that would be necessary to convert the vehicle to a highway use, it should be viewed as a "substantial" modification.

The fourth modification by the OEM/vendor was building up the right rear heavy-duty springs in order to support the substantial weight of the digger derrick equipment. None of the experts disputed the necessity of removing the asymmetrical right rear springs before the vehicle could be safely driven down the highway or used for any other purpose. All 51 vehicles in issue have a skewed rear end configuration to accommodate the digger derrick equipment, which must be corrected in order for the vehicle to be used for some other over-the-highway application. As Mr. Wiltse testified, the additional leaf springs are inserted to add support for the weight of the digger derricks. Thus, the springs add functional strength to the chassis and are integral parts of the unit as a whole. *See Halliburton*, 611 F.Supp. at 1129; *Halliburton Co. v. United States*, 4 Cl.Ct. 150, 154–55 (1983). As such, removal of these springs "would be the removal of something important or essential to the structure and therefore would constitute a substantial structural modification." *Halliburton*, 611 F.Supp. at 1129 (footnote omitted). *See also Halliburton*, 4 Cl.Ct. at 154–55 (cross-members and brackets installed added torsional strength and removal of such items constitute substantial modification to chassis in the structural sense); Rev.Rul. 80–353, 1980–2 C.B. 309 (modification of chassis by adding fishplating, cross-members, and subframes results in framework with asymmetrical configuration designed to accommodate equipment, and chassis, as modified, is substantially different structurally from chassis ordinarily used to haul other loads); Rev.Rul. 79–423, 1979–2 C.B. 386 (modification made to original construction-type chassis results in framework with special asymmetrical configuration that is custom designed for equipment, and, as modified, chassis is substantially structurally different than chassis ordinarily used for hauling other loads).

Before these digger derrick vehicles could be utilized in any other way, for any other application, they would require repair work—parts to be removed, and new parts added. A digger derrick vehicle is certainly not a vehicle that can be driven off the lot and put into service immediately. Furthermore, in light of Mr. Noble's admission that the removal of the springs would be a significant modification, and Mr. Travis' admission that the rear springs are an essential part of the chassis, this Court finds that the modifications necessary to restore the right rear springs to the original condition so that the chassis could be used in an alternative application is a substantial structural modification. Based on this conclusion alone, all 51 of the plaintiff's vehicles meet the mobile machinery exception.

The plaintiff's argument that its vehicles are not highway vehicles is further supported by the 34 vehicles containing the Waterous power takeoff, which involves the fifth modification made by the OEM/vendor. Again, all the experts agreed that a purchaser would not buy a chassis equipped with a $4,500 power takeoff if the intended purpose only required a conventional $300 power takeoff. Additionally, neither of the Government's experts could produce a photograph of an alternative application using a Waterous power takeoff.

Although both Mr. Noble and Mr. Travis testified there were other applications that could utilize the Waterous, they also admitted that it would provide more torque than would be needed and more importantly, those other applications would be limited to operating only when the truck is stationary. Virtually all of the highway use applications discussed by Mr. Noble and Mr. Travis, such as the various dump, garbage, and cement trucks, require a regular power takeoff so that the vehicle may proceed down the road as the equipment is being operated. Thus, if a $300 power takeoff is all that is required and the Waterous will severely limit the operations that can be conducted, it is not reasonable to speculate that an operator would pay the additional cost to acquire the Waterous when it is not needed. Even if the new operator would

remove the Waterous and resell it, it is unlikely that he would be able to recoup the entire amount: the cost he paid to get it, plus the cost of having it removed.

As the district court recognized:

The new regulation must be read in realistic and practical terms. A proper inquiry should be whether a chassis could *reasonably* be used as a component of a highway vehicle. Plaintiffs' chassis are not suitable for another application in their present form without major modifications.

*Halliburton*, 611 F.Supp. at 1129 (emphasis in original). It is clearly unrealistic and impractical to believe that a purchaser would buy a chassis with expensive equipment that is not needed and then pay more money to have the equipment removed. Thus, from an economic feasibility and a utility standpoint, the Waterous power takeoff would be removed if the plaintiff's chassis were purchased for another use.

If the Waterous power takeoff were removed and resold, then additional substantial modifications would be required. It was uncertain as to whether the new crossmember that was inserted for the Waterous would have to be removed, but even if it were not, new drive lines would be required to accommodate the space that the Waterous housing previously occupied. Furthermore, the plumbing equipment would have to be removed and a new parking brake installed.

As agreed by all the experts, the drive train is one of the four major components of the chassis, and Mr. Travis admitted that the drive line was a substantial and essential part of the chassis. This testimony follows the finding of the district court in *Custom Bodies*, 85–2 USTC at 90,523:

(c) The auxiliary transmission and power takeoff is part of the chassis, because the main drivetrain passes through the auxiliary transmission to the rear axle. Another use probably would require removal of this item because it extends above the height of the frame rail. *Removal of this item alone would be a major structural modification.* [emphasis added].

This Court is in agreement with the district court in *Custom Bodies* and finds that the 34 vehicles mounted with a Waterous full torque power takeoff meet the third requirement of the mobile machinery exception again by itself.

In the final analysis, this Court must rely on the rule of reason. In the abstract, it is quite clear that virtually any vehicle can be modified so as to make it useful for another purpose. The question that must be answered, however, is, in the real world, would these vehicles be modified to perform another over-the-road use? The very words used in the regulations in part C "without substantial structural modification" connote an economic feasibility or reasonability test. Is it economically feasible to modify those vehicles back from the "special design" part B of the regulations (which was conceded by the Government) to convert the vehicles to an over-the-road use? In the judgment of the Court, the answer is no! Given the combination of modifications that have been made on these vehicles, it would be economically infeasible, without substantial structural modifications, to again utilize these vehicles as over-the-road vehicles. Proof of the plaintiff's position, of course, is that they have never been so used. The vehicles in issue have always been sold for salvage or scrap.

If one looked in isolation at any one of the modifications—perhaps the Government's position is correct. But when one looks at the combination of modifications that were in fact accomplished on these vehicles, one cannot come to any other reasonable conclusion but that it is economically infeasible or impractical to convert these vehicles back to viable over-the-road vehicles without substantial structural modifications.

Perhaps what misled the Government, into taking the position it took in this case, was its reliance on its experts' views as to what amounts to a "structural" modification. The Court simply does not agree with the Government's argument and the Government's experts' opinions, that the term "structural" as used in part C of the regulations mean substantial modification

only to the frame. In this Court's view, the "structural" term used in part C means substantial modification to the chassis of the vehicle. When one applies a real world, or economic feasibility, or reasonable businessman's test to this case, one simply comes to the conclusion that the plaintiff prevails in this action and should therefore recover.

It is not the role of this Court to set the minimum and the maximum standards for the mobile machinery exception, but rather to apply only those facts presented to it by the witnesses and decide if the vehicles in issue fall within the requirements. In view of the modifications that would be required to plaintiff's chassis, as detailed herein, and the strained interpretation of the terms "substantial" and "structural" as urged by the Government, this Court finds that the requirements of the mobile machinery exception have been met. As such, the plaintiff is entitled to a refund of the taxes paid.

## CONCLUSION

For the reasons discussed herein, the plaintiff prevails in this action and is entitled to a refund of the taxes, interest, and penalties paid. In the event the parties are unable to stipulate to the exact amount of the refund due the plaintiff within 30 days, further proceedings will be scheduled. In this connection, *see* Rule 42(c).

Furthermore, to the extent the plaintiff still wishes to submit its application for attorneys' fees and costs pursuant to 26 U.S.C. § 7430(c)(4)(A)(iii) (1982), it should do so within 30 days of the date of judgment herein. *See* Rule 81(e).